**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Steven KALISH, Defendant-Appellant.**

**Nos. 80–1704, 80–1716.**

United States Court of Appeals, Fifth Circuit.

July 23, 1982.

Certiorari Denied Jan. 10, 1983. See 103 S.Ct. 735.

Dick DeGuerin, Houston, Tex., for defendant-appellant.

John M. Potter, Asst. U. S. Atty., Houston, Tex., Mervin Hamburg, Atty., Appellate Sec., Criminal Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before RUBIN and REAVLEY, Circuit Judges, and HUNTER *, District Judge.

REAVLEY, Circuit Judge:

On December 10, 1979, a government joint task force seized a shrimp boat called the EL COBRE, loaded with 40,000 pounds of marijuana, a few miles off the coast of Texas near Freeport. On December 19, 1979, the same joint task force seized an offshore supply boat called the MR. JAKE, loaded with 100,000 pounds of marijuana, as it was being unloaded at the Intracoastal Marina in Freeport.

Appellant Steven Kalish was indicted in connection with both seizures. The EL COBRE indictment, filed January 11, 1980, charged Kalish and four co-defendants with one count of conspiracy to import marijuana, 21 U.S.C. § 963, and one count of con-

* District Judge of the Western District of Louisi-  ana, sitting by designation.

spiring to possess marijuana with intent to distribute, 21 U.S.C. § 846. The MR. JAKE indictment, filed January 18, 1980, named Kalish and 36 co-defendants [1] in three counts: two counts charging violations of the same two conspiracy statutes charged in the EL COBRE indictment, and a third count charging Kalish with the substantive offense of possession with intent to distribute, 21 U.S.C. § 841(a)(1).

Kalish was tried on the EL COBRE indictment in March 1980. A jury found Kalish not guilty of both conspiracy counts of that indictment.

Prior to this April 1980 trial on the MR. JAKE indictment, Kalish filed a plea in bar, contending that his trial on the conspiracy counts of that indictment was barred by the double jeopardy clause of the Fifth Amendment to the United States Constitution. After a full hearing, the court denied Kalish's plea. Although Kalish immediately filed a notice of appeal from the trial court's ruling, see Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed. 651 (1977), the trial court refused to stay Kalish's trial pending appeal, expressly finding Kalish's double jeopardy claim to be "frivolous," see United States v. Dunbar, 611 F.2d 985 (5th Cir.) (en banc), cert. denied, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980). The court did grant Kalish's request to stay the trial pending his petition to this court for a writ of prohibition. This court denied the petition, and the trial commenced.

A jury found Kalish guilty on all three counts of the MR. JAKE indictment. After judgment was entered on the verdict, Kalish filed his second notice of appeal.

This is a consolidation of the two appeals. Kalish argues that trial on the conspiracy counts of the MR. JAKE indictment places him in double jeopardy. He also argues that his conviction on the substantive count should be reversed because the district court lacked jurisdiction to try him, because the government should have been collaterally estopped from introducing the evidence it presented at the EL COBRE trial, and because of an alleged evidentiary error.[2]

We reverse Kalish's conviction on the two conspiracy counts. We affirm his conviction on the substantive count.

## I. Double Jeopardy

### A. Procedural Considerations

In the usual *Abney* appeal from a pretrial ruling denying a double jeopardy plea, the court has only the record of the pretrial hearing on the question whether the impending trial concerns the same offenses previously tried. In such pretrial proceedings, the defendant has the burden "to tender a prima facie nonfrivolous double jeopardy claim," *United States v. Stricklin*, 591 F.2d 1112, 1117 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); it is then the government's burden to prove by a preponderance of the evidence, prior to trial, that the indictments charge different crimes. *Id.* at 1118.

Because the district court proceeded to trial in this case, however, we have the record of the second trial to help us determine whether the indictments involved different conspiracies. The court might first consider the pretrial record alone, and then, if it determined that the government was entitled to prevail on the pretrial motion, consider the trial record to determine if appellant was actually tried for the same offense.

We need not take those steps here. The government did not meet its pretrial burden of proving that the indictments concerned different conspiracies, and we think that the trial record confirms that conclusion.

---

**1.** The appeals of 23 of these co-defendants are decided today in *United States v. Saa-Hinestorza*, 689 F.2d 190 (5th Cir. 1982) (table).

**2.** Kalish also adopts the arguments of the appellants in *United States v. Saa-Hinestorza, su-* pra note 1, that the MR. JAKE indictment should be dismissed because of alleged prosecutorial misconduct before the grand jury. We discuss and reject those arguments in *Saa-Hinestorza.*

### B. *The Evidence*

At both trials, the only evidence sufficient to connect Kalish to the loads of marijuana was the testimony of Tommy Troutwein. Troutwein was the manager of the Intracoastal Marina, which was located on the Intracoastal Waterway in Freeport, Texas. The waterway provides access to the Gulf of Mexico.

Troutwein was a friend of Bobby Weaver, a United States Customs Patrol Officer. Weaver was a member of a task force that was investigating smuggling activity on the waterway. The task force included Customs, Coast Guard, Drug Enforcement Administration (DEA) and local officers. Weaver usually worked in an undercover capacity, often posing as the private owner of an unmarked speedboat that Customs had docked at the Intracoastal Marina.

Weaver believed that the marina was a likely place for smuggling activity, and sometime in the late spring or early summer of 1979 he asked Troutwein to pass along any information he obtained about smuggling activity. Troutwein agreed. It was Troutwein's information that focused the government's suspicion on Kalish.

### 1. *The Evidence at the EL COBRE Trial*

At the EL COBRE trial, Troutwein testified as follows: He first met Kalish on August 7, 1979. Kalish was introduced to him as "Steven Kay" by two other men whom Troutwein suspected of marijuana smuggling. Kalish and his companions were interested in leasing a shrimp boat owned by Troutwein's boss, Robert Brushingham, the owner of the marina. The shrimp boat was located at a different dock in downtown Freeport. Troutwein agreed to take Kalish to see the boat. The two travelled alone. During the ride, Kalish told Troutwein that he made a lot of money in "the smuggling business." After the two arrived at the dock and boarded the shrimp boat, Kalish commented on the boat's marijuana-hauling capacity.

The next day, Kalish arrived at the marina with two different men whom he introduced to Troutwein as "Peaches" and "Doc." [3] Kalish asked Troutwein to allow Peaches and Doc to spend their nights at the marina conducting surveillance. Peaches and Doc spent about 10 consecutive weeknights at the marina, making logs of the nightly traffic along the waterway.

Officer Weaver corroborated Troutwein's testimony that Kalish had been present at the marina in August 1979. On August 7 or 8, Troutwein introduced Kalish to Weaver. Kalish asked if Weaver would take him for a ride on the speedboat at a later date. Weaver agreed. A few days later, Weaver took Kalish and Troutwein for a ride. During the ride, Kalish told Weaver that he might need to use the boat at a later date "in an errand-running capacity."

Troutwein testified that, after these two or three meetings in August, he had no further contact with Kalish until December 6, 1979. On that day, Kalish approached Troutwein while he was working on the marina's fuel dock. Kalish gave Troutwein $1,000 in $100 bills, told Troutwein that he was "making arrangements for a load," and said that he would return in a few days to discuss "unloading there at the marina."

Kalish returned to the marina on December 8. He offered Troutwein $50,000 for letting him unload at the marina. Kalish told Troutwein that the unloading would take place "relatively soon."

On the morning of December 10, Kalish came into Troutwein's office at the marina. Four persons accompanied him: Bill Boren, "a pilot," and two other persons whom Troutwein could not identify. Kalish told Troutwein that he needed a boat to send his companions out to meet a shrimp boat. Troutwein suggested that Kalish telephone Weaver to ask about leasing Weaver's speedboat. The call was made. Weaver corroborated this testimony, testifying that Kalish asked him whether he would lease the speedboat for an "errand." Weaver told Kalish that the boat needed repairs.

---

**3.** Troutwein subsequently identified "Doc" as Richard Yates, one of the appellants in *United States v. Saa-Hinestorza, supra* note 1. "Peaches" has never been identified.

After the phone call, Troutwein told Kalish that he had a single boat available, the MISS CLARA, but that if Kalish wanted to use it he would have to buy it for $35,000. Kalish reluctantly agreed, giving Troutwein $5,000 and telling him he could pick up the balance that day in Houston. Then Kalish's four companions went out to sea in the MISS CLARA.

Troutwein testified that Kalish remained at the marina for a time and that the two of them had another meeting with "other people," including Bud Stockton and Judd McCormick.[4] For reasons that will become clear below, Troutwein was asked not to testify to the substance of this conversation. Afterwards, Troutwein followed Kalish to Houston in Bill Boren's car. In Houston, Kalish gave Troutwein another $15,000 for the MISS CLARA.

Meanwhile, Weaver had alerted his task force about the voyage of the MISS CLARA. Aerial surveillance teams observed the MISS CLARA rendezvous with the shrimp boat EL COBRE. After the MISS CLARA departed, the EL COBRE was stopped and boarded; officers found 40,000 pounds of marijuana and a four-member crew. One of the crew was Bill Boren. These four became Kalish's four co-indictees in the EL COBRE case.

When Troutwein returned to the marina from Houston, he found the crew of the MISS CLARA waiting to use Bill Boren's car. Troutwein noticed that Boren was no longer among them; he had been replaced by a "Latin-looking" individual. The four left in Boren's car and were never apprehended.

Despite Troutwein's story and Weaver's circumstantial corroboration of that story, a jury found Kalish not guilty of the EL COBRE charges.

### 2. *The Pretrial Hearing on the Plea in Bar*

At the pretrial hearing on the plea to bar the trial of the MR. JAKE conspiracy charges, Kalish contended that the government would attempt to reintroduce all the evidence presented at the EL COBRE trial to prove Kalish's involvement in the conspiracy. Kalish also introduced two written pretrial statements signed by Troutwein. In the first statement, dated December 11, 1979, Troutwein claimed that Kalish had made the $1,000 payment on December 6 in connection with a discussion about unloading *both* a shrimp boat (which turned out to be the EL COBRE) and a supply boat (which turned out to be the MR. JAKE). During that same discussion (not on December 8, as Troutwein had testified at the EL COBRE trial), Kalish offered Troutwein $50,000 for the unloading of the EL COBRE and $150,000 for the unloading of the MR. JAKE. At the December 8 meeting, Kalish again discussed both the EL COBRE and the MR. JAKE, and increased Troutwein's share for the unloading of the MR. JAKE to $1,000,000.

According to the December 11 statement, the December 10 meeting with the "other people" after the MISS CLARA had departed concerned the arrangements for unloading the MR. JAKE. Kalish and the "other people" gave Troutwein "good faith money"—the written statement does not say how much—in addition to the $5,000 that Kalish had given Troutwein earlier in the day for the MISS CLARA.

Troutwein's second written statement, dated December 20, 1979, described his contacts with Kalish from December 11 through December 19. The statement described a December 13 meeting concerning the MR. JAKE operation with Kalish and three other persons. One of the persons was the same man who had piloted the MISS CLARA. The statement also claimed that on December 18, "Doc" returned to the marina to spend the night and "make sure everything was alright" for the unloading of the MR. JAKE.

Based on this presentation, Kalish argued that the EL COBRE and the MR. JAKE

---

4. Stockton and McCormick were both convicted on the second and third counts of the MR. JAKE indictment. McCormick's appeal is decided today in *United States v. Saa-Hinestorza*, *supra* note 1.

operations were part of the same conspiracy: the government intended to introduce the same pre-December 11 evidence to show Kalish's participation in the conspiracy; on December 6 and 8, Kalish made arrangements with Troutwein for both operations simultaneously, giving Troutwein $1,000 in connection with both operations; the government's evidence showed that "Peaches," "Doc," and the pilot of the MISS CLARA were engaged in both operations, and the evidence at the EL COBRE trial had also suggested that Stockton and McCormick, MR. JAKE conspirators, were somehow involved in the EL COBRE operation. Kalish also relied on the government's presentation of the EL COBRE and MR. JAKE cases to the same grand jury: in both presentations, the government's witnesses told the grand jury that the crimes were committed by "Kalish's organization" which was controlled and funded by "people in Florida."

In attempting to prove that there were two separate conspiracies, the government did not contest that it would reintroduce the evidence against Kalish presented at the first trial, although it agreed not to introduce evidence concerning the seizure of the EL COBRE. Instead, the government put Troutwein on the stand to testify that on December 10, Kalish was "nervous" about keeping "separate" the group going out to the EL COBRE and the group coming in to discuss the MR. JAKE. This testimony was corroborated by Troutwein's December 11 written statement: "Apparently the shrimp boat and the supply boat are two separate deals because Steve was real nervous about keeping the two groups separated." However, this testimony was little more than a conclusion; and when the district judge directed Troutwein to state the facts upon which he based his conclusion, the only fact on which Troutwein relied was Kalish's insistence that he needed a boat immediately to get his companions out to meet the EL COBRE.

Despite the weakness of the government's showing, the district court denied the plea in bar.

### 3. The MR. JAKE Trial

At the MR. JAKE trial, Troutwein and Weaver indeed repeated their testimony concerning the activities of Kalish, Doc, Peaches, Stockton, and McCormick prior to December 11. There were few variations.[5] This time the December 6 payment of $1,000 was given in connection with unloading the MR. JAKE; the EL COBRE was not mentioned. As for the December 8 meeting, only the $1,000,000 offer concerning the MR. JAKE was described. In describing the activities of December 10, Troutwein told of Kalish's request for a boat, his phone call to Weaver, and the events surrounding the sale of the MISS CLARA; only the mission of the MISS CLARA was omitted. Troutwein filled in the details of the meeting with Stockton and McCormick and testified that the amount of the "good faith money" given for the MR. JAKE operation was $20,000.

Troutwein also testified about the December 13 meeting with Kalish, during which Kalish promised that he was getting "money from New York" to pay for both the MR. JAKE operation and the balance of the sale price of the MISS CLARA. On December 14, "either Peaches or Doc" brought Troutwein $5,000 of the "money from New York" as a partial advance payment for refueling the MR. JAKE. On December 16, Kalish returned to the marina with Judd McCormick and a man named "Barry." Kalish gave Troutwein $10,000 more for fuel, $5,000 more for the MISS CLARA, and $1,000 to make alterations on the dock for the unloading of the MR. JAKE. Finally, Troutwein testified to Doc's reappearance to spend the night "keeping an eye on things" shortly before the MR. JAKE was to be unloaded.

**5.** For example, at the EL COBRE trial Troutwein testified that Kalish had made his incriminating statement about being in the smuggling business on August 7, the day they first met. At the MR. JAKE trial (and in his December 11 pretrial statement), Troutwein said that Kalish made the statement at their second meeting on August 8, the same day that Kalish introduced "Doc" and "Peaches."

### C. One Conspiracy or Two?

The commission of crimes at different times does not necessarily prove that the crimes were carried out by different conspiracies. A conspiracy is an unlawful agreement; if the same unlawful agreement has as its object the commission of crimes on different occasions, there is still but one conspiracy. *See United States v. Marable*, 578 F.2d 151, 153 (5th Cir. 1978).[6]

It is always difficult to identify the objects of and the parties to an unlawful agreement. Therefore, the courts must look to circumstantial evidence to determine the conspiracy's scope. In *United States v. Marable*, we listed five factors that help determine whether there is but a single conspiracy:

(1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

578 F.2d at 154. We examine these factors in turn.

1. *Time*—The EL COBRE indictment alleges a conspiracy "From an unknown time and continuing [until] December 10, 1979"; the MR. JAKE indictment, "From an unknown time and continuing until December 19, 1979." The proof of both conspiracies at trial began with the same event: Kalish's approach to Troutwein in August 1979.

In the district court, the government argued that the seizure of the EL COBRE and the arrest of its crew was an event that destroyed the first conspiracy. While we do not quarrel with the proposition that such an event can sometimes terminate a conspiracy, there is no evidence in this record that a termination occurred here. To the contrary, Kalish made arrangements with Troutwein for both the EL COBRE and the MR. JAKE before the EL COBRE seizure, and almost always made the arrangements simultaneously; after the EL COBRE seizure, the MR. JAKE operation continued as planned.

We think that the proximity of events tends to support the existence of a single conspiracy.

2. *Personnel*—The EL COBRE indictment names Kalish and four others who were not named in the MR. JAKE indictment. The four were those found on board the EL COBRE. We do not think it very significant that these four arrestees were absent from the MR. JAKE unloading nine days later.

The government's evidence demonstrated that several of the more important conspirators—Kalish, "Peaches," "Doc," and the pilot of the MISS CLARA—were participants in both crimes. Most of the other persons arrested were more minor players—the crew of the EL COBRE, the crew of the MR. JAKE, and about two dozen individuals hired to work as longshoremen and truck drivers on the MR. JAKE offloading. That the conspiracy must take on additional members to accomplish one of its objects does not in itself establish a different conspiracy. *See, e.g., United States v. Michel*, 588 F.2d 986, 995 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979).

3. The underlying statutory offenses are, of course, identical.

4. *Acts charged in the indictment and those proved at trial*—The EL COBRE indictment charged Kalish with the overt act of purchasing the MISS CLARA to rendezvous with the EL COBRE. The purchase of the MISS CLARA, though not its purpose, was proved at the MR. JAKE trial. The

---

**6.** Of course, the government can constitutionally impose a separate punishment for each statute that the conspirator has agreed to violate, provided Congress has authorized such punishment. *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). For example, there is no dispute in this case that the government can impose separate punishments for the conspirators' agreement to import and for the conspirators' agreement to possess with intent to distribute.

MR. JAKE indictment alleged no overt acts.

At both trials, the same acts were presented as proof of the conspiracy: the surveillance by Doc and Peaches in August 1979; the $1,000 payment to Troutwein on December 6; the meeting at the marina on December 8. Kalish's August statements about smuggling marijuana were introduced at both trials. The evidence at the MR. JAKE trial tended to show that Kalish's funds for the purchase of the MISS CLARA and the fuel for the MR. JAKE came from the same source.

The government points out that a single act can be performed in furtherance of two separate conspiracies. But this general proposition proves nothing: a single act can also be performed in furtherance of a single conspiracy. The government fails to point to any direct or circumstantial evidence that there were, in fact, two separate conspiracies.

5. *Geography*—The EL COBRE indictment alleges that the events occurred "On the high seas and elsewhere"; the MR. JAKE indictment, "Within the Southern District of Texas and elsewhere." The proof at the EL COBRE trial showed that the "elsewhere" was the Southern District of Texas and Colombia; the proof at the MR. JAKE trial showed that the "elsewhere" was the high seas and Colombia. The geographic locations were thus identical.

As we have said, when a defendant establishes a prima facie, nonfrivolous double jeopardy claim on a pretrial motion, the burden is on the government to prove by a preponderance of the evidence that the indictments charge different conspiracies. *See United States v. Stricklin*, 591 F.2d at 1117–18. We conclude that the government never met its pretrial burden. While the scope of a conspiracy is rarely clear-cut, we must conclude that the evidence in the record tends to show that Kalish was involved in a single, continuing conspiracy to import marijuana and to possess it with intent to distribute.[7] "[T]he participants shared a continuing, common goal of buying and selling marijuana for profit; the operations of the conspiracy followed an unbroken and repetitive pattern; and the cast of conspirators remained much the same." *United States v. Ruigomez*, 576 F.2d 1149, 1151 (5th Cir. 1978). Therefore, Kalish's trial on the conspiracy counts of the MR. JAKE indictment was barred by the double jeopardy clause.

### D. *Waiver of Double Jeopardy?*

The government argues that Kalish waived his double jeopardy claim because (1) he filed a successful motion *in limine* to exclude any evidence concerning the MR. JAKE episode from the EL COBRE trial on the ground that the two events involved separate conspiracies and (2) he did not request a consolidation of the two indictments. We do not think that this action and omission, either separately or cumulatively, constitute waiver.

At the time he filed his motion *in limine* Kalish was facing two trials on two indict-

---

**7.** The lack of evidence of separate conspiracies distinguishes this case from the cases relied on by the government. In *United States v. Futch*, 637 F.2d 386 (5th Cir. 1981), although there was some overlap in the time periods alleged in the indictments, Futch had been tried and acquitted of the first charge before the events precipitating the second indictment occurred; there were nine co-conspirators named in the first indictment, and eight in the second, and only one was the same; the two shrimp boat offloadings occurred in different, noncontiguous counties; and despite the existence of a government informant in the second conspiracy, the informant had provided the investigating officers no information concerning the earlier conspiracy. *See id.* at 390–91. *United*

States v. Tammaro, 636 F.2d 100 (5th Cir. 1981), involved conspiracies to commit different substantive crimes and all the significant acts in the second conspiracy took place after the first one had ended. *See id.* at 101, 104; *see also Stricklin*, 591 F.2d at 1122 ("The Double Jeopardy Clause imposes few limits on the legislative power to define offenses, and Congress may choose to punish two aspects of conspiratorial behavior without violating the Fifth Amendment."). *United States v. Parker*, 582 F.2d 953 (5th Cir. 1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979), is similar, involving a bombing conspiracy and a subsequent conspiracy to obstruct the investigation of the first conspiracy. *See id.* at 954.

ments. It was the two indictments that defined the EL COBRE operation and the MR. JAKE operation as separate conspiracies. The EL COBRE indictment alleged a conspiracy concerning the 40,000 pounds of marijuana seized aboard the EL COBRE; the MR. JAKE indictment alleged a conspiracy concerning the 100,000 pounds of marijuana seized aboard the MR. JAKE. Given that the government was alleging that there were two separate conspiracies, we cannot fault Kalish for arguing that acts in furtherance of one alleged conspiracy should not be introduced as acts in furtherance of another alleged conspiracy. Kalish could not know at the time whether any claim of double jeopardy at the MR. JAKE trial would be successful. Whether the trial court ruled correctly on Kalish's EL COBRE motion, or whether the government could have introduced the MR. JAKE evidence as proof of "similar acts," see Fed. R.Evid. 404(b), are issues not properly before us.

Nor do we think that Kalish had any responsibility to suggest the possibility of consolidation to the government. The government had chosen to plead two separate conspiracies; Kalish could properly assume that the government would attempt to prove two separate conspiracies. We think it an unusual proposition that a defendant must inform the government of the true nature of the crimes. The government's reliance on *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), is misplaced. In *Jeffers*, a four-Member plurality of the Supreme Court decided that a defendant waived his double jeopardy claim when he actively opposed the government's motion to consolidate two indictments charging greater and lesser included offenses. *See id.* at 152–54, 97 S.Ct. at 2217–18. Kalish did not oppose any effort by the government to resolve the double jeopardy problem; there was none.

We recognize that the *Jeffers* plurality responded to the defendant's argument that

he had a valid ground for opposing consolidation—the prejudicial joinder of co-defendants—by pointing out that the defendant could have moved for a severance rather than opposing the motion to consolidate, *see id.* at 143, 153 n.21, 97 S.Ct. at 2212, 2217 n.21, and by declaring that the defendant had a "responsibility to bring the [double jeopardy] issue to the District Court's attention" at the time of the consolidation motion, *id.* at 154 n.22, 97 S.Ct. at 2218 n.22. We do not think, however, that this part of *Jeffers'* rationale can be extended to Kalish's case.[8] To require a defendant facing two conspiracy indictments to make the initial motion to consolidate because there is only one conspiracy is to require him to inform the government that it misapprehends the facts. By contrast, the *Jeffers* plurality was merely pointing out that the defendant could have preserved his double jeopardy rights and avoided prejudicial joinder by requesting a severance rather than opposing the consolidation that would have resolved the double jeopardy problem.

We hold that Kalish did not waive his double jeopardy claim.

## II. The Substantive Conviction

### A. Trial Court Jurisdiction

■ Kalish argues that the filing of his *Abney* appeal deprived the trial court of jurisdiction "to try the MR. JAKE case." It is not clear from Kalish's brief whether he believes that the district court was deprived of jurisdiction over the substantive count as well as the conspiracy counts. Nevertheless, we address the issue because the question of jurisdiction is one the court should raise on its own motion.

■ In *United States v. Dunbar*, 611 F.2d 985 (5th Cir.), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980), a unanimous en banc court held that an appeal from a pretrial double jeopardy motion which "the district court has found . . . to be frivolous" does not divest the trial court of jurisdiction. *Id.* at 986. Our con-

---

8. We also note that this part of the plurality's rationale was sharply criticized by an equal number of Justices. *See id.* at 160, 97 S.Ct. at 2221 (Stevens, J.) (joined by Brennan, Stewart & Marshall, JJ.).

clusion that Kalish's pretrial motion was meritorious, however, makes it plain that the district court's finding of frivolity was erroneous.

While the double jeopardy claim in *Dunbar* was frivolous, our opinion made it clear that it is the district court's *finding* of frivolousness that creates "dual jurisdiction." 611 F.2d at 989. "If the claim is *found to be frivolous* [by the district court], the filing of a notice of appeal shall not divest the district court of jurisdiction over the case." *Id.* at 988 (emphasis added). We later explained:

> If an appeal from a motion decided to be frivolous by the district court is found meritorious by the appellate court, the conviction in the district court would be reversed. If found *not to have merit*, jurisdiction for the trial which occurred during the appeal would be affirmed.

*Id.* at 989 (emphasis added). Thus, our function on appeal is to determine whether the double jeopardy claim has merit, not to review the district court's finding of frivolousness. Even if the district court has erred in its finding, jurisdiction will be affirmed if the claim is "found not to have merit."

If an *Abney* appeal from a nonfrivolous pretrial double jeopardy motion, which the district court has found to be frivolous, does not divest the district court of jurisdiction over the counts allegedly barred by the double jeopardy clause, then it certainly does not divest the court of jurisdiction over the counts that defendant concedes are not barred by the double jeopardy clause. Kalish concedes that the double jeopardy clause does not prevent him from being put to trial on the substantive possession charge.

We recognize that *Dunbar* makes the district court's finding of frivolousness unreviewable, unless this court intervenes "by staying proceedings below pending appeal, F.R.A.P. 8, or by issuing a writ of mandamus or prohibition, 28 U.S.C.A. § 1651." 611 F.2d at 989. But to hold that the

district court lacked jurisdiction because of an erroneous finding of frivolousness would create the anomalous prospect of "protecting" double jeopardy rights by ordering yet a third trial.

This case demonstrates that the district courts must adhere to the literal meaning of the term "frivolous," and that this court must carefully scrutinize petitions for expedited relief from findings of frivolousness. In *Abney*, the Supreme Court recognized a statutory right to a pretrial appeal largely because "the rights conferred ... by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence.... [The Clause] is a guarantee against being twice put to *trial* for the same offense." *Abney*, 431 U.S. at 660–61, 97 S.Ct. at 2040–41. The whole purpose of *Abney* is defeated when district courts proceed to trial because they do not believe the defendant's double jeopardy plea is sufficiently meritorious to warrant a stay. *Dunbar* was intended to prevent dilatory claims, not colorable ones.

We are mystified by the district court's finding of "frivolousness" in this case. In *Dunbar*, the appellant's double jeopardy argument was a purely legal one which was foreclosed by numerous decisions of the Supreme Court and of this court. *See United States v. Dunbar*, 591 F.2d 1190, 1192–93 (1979), *adopted in relevant part en banc*, 611 F.2d at 987. This case, by contrast, involves the difficult question whether one person's continuing activities in identical narcotics transactions are carried out as a member of one or more conspiracies.

■ The court's erroneous finding, however, did not relate to the substantive count against Kalish.[9] We hold that the district court was not divested of jurisdiction over this count, and we proceed to the merits.

### B. *Collateral Estoppel*

Prior to trial, Kalish moved to exclude all evidence introduced at the EL COBRE trial

---

**9.** Moreover, the joinder of the substantive count with the barred conspiracy counts was not prejudicial. All of the evidence of Kalish's transactions with Troutwein was relevant to prove his participation in the substantive offense.

on grounds of collateral estoppel. The district court denied this motion as "too broad."

In criminal cases, the government is barred from relitigating a fact issue "only if the jury could not rationally have based its verdict on an issue other than the one the defendant seeks to foreclose.... When a 'fact is not *necessarily* determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue.'" *United States v. Lee*, 622 F.2d 787, 790 (5th Cir. 1980) (citation omitted), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981).

On this appeal, Kalish argues that the EL COBRE jury necessarily resolved the issue of Troutwein's credibility against the government. Kalish never narrowed his request to exclusion of Troutwein's testimony on this ground. And even if he had, we conclude that this proposed exclusion of evidence is still "too broad." The EL COBRE jury did not necessarily find that Troutwein's every statement concerning his dealings with Kalish was untrue.[10] The party claiming estoppel must make some attempt to define precisely the factual issue necessarily decided in the prior trial. *See United States v. Giarratano*, 622 F.2d 153, 156 n.4 (5th Cir. 1980).

The district court did not err in its ruling on collateral estoppel.

### C. Concealment of Identity

When Kalish was arrested by state police on January 23, 1980, for possession of cocaine, he gave the arresting officer an alias and a false driver's license. He repeated the alias when asked his name by the state booking officer. The district court allowed the prosecution to prove the fact of arrest and the use of the alias, but not the offense leading to the arrest. The court reasoned that the evidence showed Kalish's consciousness of guilt.

This court has long and consistently held that a defendant's attempt to conceal his identity from an arresting officer by the use of an alias is relevant as proof of consciousness of guilt. *E.g., Jordan v. United States*, 324 F.2d 178 (5th Cir. 1963); *United States v. James*, 576 F.2d 1121, 1125 (5th Cir. 1978), *adopted in relevant part en banc*, 590 F.2d 575, 577 (5th Cir.), 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Khamis*, 674 F.2d 390, 395 (5th Cir. 1982); *cf. United States v. Mesa*, 660 F.2d 1070, 1077–78 (5th Cir. 1981) (renting hotel room under assumed name). Similarly, we have consistently held evidence of flight to be relevant evidence. *E.g., United States v. Meneses-Davila*, 580 F.2d 888, 896 & n.16 (5th Cir. 1978) (collecting cases); *United States v. Stewart*, 579 F.2d 356, 359 (5th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978). Since use of an alias is relevant evidence, our standard of review is whether the trial judge has abused his discretion in determining that the probative value of the evidence outweighs the danger of unfair prejudice. Fed.R.Evid. 403; *see United States v. Stewart*, 579 F.2d at 359; *United States v. Blevinal*, 607 F.2d 1124, 1128 (5th Cir. 1979) (standard of review of trial judge's Rule 403 determinations), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980).

We find no abuse of discretion here. Kalish was arrested within weeks of his alleged involvement in, and within days of his indictment for, operations involving 140,000 pounds of marijuana. *Cf. Jordan v. United States*, 324 F.2d at 178 (defendant not arrested until 8 months after the offense); *United States v. Alonzo*, 571 F.2d 1384, 1386 (5th Cir.) (defendant living under assumed name not arrested until 18 months after his co-conspirators had been tried), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). That the immediate cause of Kalish's arrest was an unrelated offense does not destroy the permissible inference that Kalish was attempting to avoid being brought to trial for the MR. JAKE operation. *See United States v. $364,960.00 in United States Currency*, 661

---

10. Indeed, the jury could have believed everything except Troutwein's testimony connecting Kalish to the EL COBRE; and this testimony *was* excluded from the MR. JAKE trial.

F.2d 319, 324 (5th Cir. 1981) (forfeiture action) (possibility that suspects were fleeing because they were illegal aliens, not because of their possession of narcotics, does not make evidence of flight inadmissible); *cf. United States v. Mesa*, 660 F.2d at 1078 (possibility that use of alias may have had innocent motive neither affects admissibility nor makes flight instruction erroneous).

Kalish argues that the evidence was inadmissible under *United States v. Myers*, 550 F.2d 1036, 1048–51 (5th Cir. 1977), *after remand*, 572 F.2d 506 (5th Cir.), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). *Myers*, however, did not involve the question of admissibility of alias evidence; rather, it involved the question of the propriety of a flight instruction when the evidence of flight was insufficient. The court held that "a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for" four necessary inferences. *Id.* at 1050.[11] The court acknowledged, however, the firm rule of this circuit that flight evidence is generally admissible, *see id.* at 1049 (collecting cases), and it implicitly recognized that the standard for determining admissibility was not its new rule on flight instructions, but Rule 403, *see id.* at 1050 n.20.

In this case, Kalish made no objection to any of the trial court's instructions.[12] Instead, he reads the *Myers* four-inference test as a test of admissibility for evidence of flight, as well as for evidence of concealment of identity. He argues that the third *Myers* inference—that the defendant's behavior indicates consciousness of guilt of the particular crime charged—cannot be drawn with confidence here because it is

more likely that Kalish's use of an alias showed consciousness of guilt only of the unrelated offense for which he was arrested.

We recognize that Kalish's reading of *Myers* has some basis. If *Myers* holds only that a jury cannot be instructed on the use of evidence of flight until there is sufficient evidence to support the four inferences, but that the evidence may nevertheless be admitted, then the *Myers* opinion may create a worse danger of unfair prejudice from evidence of flight than it attempted to eliminate. If evidence is admitted, then the jury should be instructed on its proper use.

Nevertheless, this court has not analyzed questions of admissibility under the *Myers* four-inference test. To the contrary, we have most often cited *Myers* for the rule that evidence of flight is generally admissible to prove consciousness of guilt.[13] We have read *Myers* to hold only that the flight instruction was erroneous "because the allegations of flight were without support in the [*Myers*] record." *United States v. $364,960.00 in United States Currency*, 661 F.2d at 324 n.13.

Even if *Myers* implies the test for admissibility of the evidence, however, we believe that the third inference—that Kalish's behavior indicated consciousness of guilt of this crime and not merely of the unrelated crime for which he was arrested—may be drawn here. An attorney called by Kalish testified that, prior to the indictments, he advised Kalish that Kalish might be indicted. The attorney said that he had no trouble communicating with Kalish in the period following the seizure of the MR. JAKE, but that Kalish became unavailable after the indictments were filed. We think that

---

**11.** The four inferences must be drawn "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Myers*, 550 F.2d at 1049.

**12.** The trial court gave no instruction expressly concerning the use of an alias or flight evidence. It did, however, instruct the jury that

"what a defendant does ... when arrested ... may indicate intent ... to commit the offense charged."

**13.** *E.g., United States v. Khamis*, 674 F.2d at 395; *United States v. $364,960.00 in United States Currency*, 661 F.2d at 324; *United States v. Meneses-Davila*, 580 F.2d at 896 n.16; *United States v. Stewart*, 579 F.2d at 359; *United States v. McLaughlin*, 578 F.2d 1180, 1184 (5th Cir. 1978).

Kalish's sudden unexplained unavailability tends to prove a pattern of concealment or flight that began before his state arrest and continued with his use of the alias.[14] Kalish was carrying around the false identification card before he ever knew that the state police would arrest him for a separate offense. The close proximity in time between the crimes, the indictments, and the use of the alias further supports the inference of guilty knowledge concerning the loads of marijuana.

Finally, we note that the evidence played a small role in Kalish's trial. The crucial question was Troutwein's credibility; if believed, Troutwein's testimony was much more than sufficient to convict. The evidence of concealment had little bearing on this central issue.

### Conclusion

Kalish's conviction on count 3 is AFFIRMED. His convictions on counts 1 and 2 are REVERSED.

---

14. Kalish argues that the attorney's inability to reach him proves that he never learned about the indictments. We think that Kalish's sudden unavailability after the indictments were filed tends to prove exactly the opposite. Moreover, we doubt that proof of knowledge of the indictment is even required. It is guilty knowledge of the crime, not knowledge of accusations of crime, that use of an alias is introduced to prove.