UNITED STATES of America, Plaintiff-Appellee,

v.

Billy Joe NICHOLS, Defendant-Appellant.

No. 83–3511.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1984.

Rehearing and Rehearing En Banc Denied Oct. 22, 1984.

member of the court when this case was decided by the court en banc and did not participate in this decision.

Orr & Davis, Stephen M. Orr, Austin, Tex., for defendant-appellant.

John P. Volz, U.S. Atty., Harry W. McSherry, Donald L. Foret, Warren L. Montgomery, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before GEE, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

The appeal of Billie Joe Nichols poses two double jeopardy inquiries: (1) do prior convictions of conspiracy to import cocaine, 21 U.S.C. §§ 963, 952, and conspiracy to possess with intent to distribute cocaine, 21 U.S.C. §§ 846, 841(a)(1), based upon one shipment of cocaine, bar the pending prosecution for the substantive offenses of importing and possessing cocaine with intent to distribute, 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 2; and (2) do those convictions bar the prosecution of charges of conspiracy to import cocaine and of conspiracy to possess with intent to distribute cocaine based on earlier shipments? The district court rejected both pleas of double jeopardy. Concluding that the conspiracy convictions present no bar to trial of the charges on the substantive violations, we affirm that part of the trial court's jeopardy ruling. But concluding that the record reflects one on-going conspiracy, we reverse and direct

dismissal of the pending conspiracy charges.

*Facts and Procedural Background*

This case involves the smuggling of cocaine by use of aircraft, from Colombia into the United States. The four indictments handed up involve four flights, three completed and one planned but interrupted before completion. In each, Nichols was either at the controls or was scheduled to be the pilot of the contraband-carrying aircraft. Our ruling today turns on a close look at the four smuggling incidents, including an examination of the characters, their modus operandi, and all of the relevant parts of the operation.

The mise-en scene begins in 1980 when Claude Griffin began smuggling and selling marihuana. By 1982, Griffin and Fernando Lopez, a Colombian with shipping ties in New Orleans, conspired to smuggle cocaine from Colombia by air into Louisiana. Lopez, who had contacts in Colombia and claimed a ready source of supply, assumed primary control of the operation. Griffin was second in command. Each contacted and engaged other persons to perform various functions. According to Griffin, who turned state's evidence, he and Lopez intended to continue the operation for an indefinite period, smuggling as much as they could.

Griffin and Lopez hired James Edward Eakes and Robert L. Ross to handle the actual transportation. Eakes and Ross employed Nichols to pilot their aircraft. Each flight was to originate in the United States, fly to Colombia for loading, refuel in Belize, and return to a remote strip near Raceland, Louisiana, a small town in the South Louisiana bayou country.

The first trip was planned in June of 1982 and brought to fruition in July 1982. Lopez and Griffin were at the center of planning for this trip, as they were for all trips. Eakes and Ross, hired to do the actual transporting, hired Nichols to fly their aircraft, a Piper Aztec. Lopez made arrangements with an unidentified source in Colombia. Nichols flew the Piper Aztec and smuggled 100 kilograms of cocaine from Colombia to Raceland. This trip is the basis for indictment number CR–83–305 returned June 24, 1983.

As the July trip was being finalized, Lopez and Griffin planned the second trip. Lopez made arrangements with a new supplier, the Rodriguez brothers. Eakes and Ross were hired and they again put Nichols in the cockpit. In August of 1982, Nichols ferried 250 kilograms of cocaine from Colombia to Raceland in the Piper Aztec. After this flight, Nichols met with Griffin, Eakes, Ross, and Thomas Paul Gray. During the course of their discussions over what appeared to be too many drinks, a dispute over money arose and Griffin, Eakes, and Ross had a "falling out." The August 1982 trip is the foundation for indictment number CR–83–306 returned June 24, 1983.

Following the Griffin/Eakes/Ross difficulty in September 1982, Griffin reached an agreement with Nichols and E. Lee Morris to fly the next load, which was then being planned for October 1982. The suppliers for that transaction were again the Rodriguez family; the origination, refueling and destination points were the same; and Nichols was to be the pilot. A different aircraft was used. That aircraft, a Bonanza, developed mechanical trouble, and Nichols was grounded in Belize. Their hand forced, Griffin and Lopez made arrangements with Eakes and Ross to transport the cocaine from Colombia to Louisiana. They did so in their Piper Aztec, picking up 250 kilograms of cocaine. Insofar as this record reflects, Eakes, Ross, and their plane vanished. The October 1982 flight, the third trip, is referred to in the evidence as the "rip load." It serves as the predicate for indictment number CR–83–168, returned July 8, 1983. Although indicted for his participation in this trip, Nichols has not yet been brought to trial on these charges, and they are not a part of this appeal.

As the October 1982 trip began, the planning for the fourth trip was already underway. A new conspirator, Dr. Isaac H.

Saltz (referred to in the stipulation and in briefs as Harry) came on stage. The record is unclear as to the full extent of Saltz's role, but it does appear that he was to help Lopez and Griffin with the financing for the acquisition of a Piper Navaho aircraft for use in the continuing smuggling operations. The Eakes-Ross aircraft was not available, nor was the Bonanza. An aircraft was essential. Otherwise, the post-October 1982 trips were to involve the securing of cocaine from the Rodriguez brothers in Colombia, refueling in Belize, and the landing and offloading at the Raceland strip. Nichols was to be the pilot. The fourth and any additional loads were aborted. No more flights were made. Fearing discovery, indeed the operation was under surveillance, Griffin fled to Honduras and began negotiations which led to a plea bargain with the government. In return for his cooperation, Griffin was not indicted for the first two loads. The planning for the fourth and subsequent trips resulted in indictment CR–83–166, returned March 25, 1983. After a trial lasting several days, on August 5, 1983, Nichols was found guilty of conspiracy to import cocaine and conspiracy to possess with intent to distribute cocaine. He was sentenced to concurrent seven and one-half year terms.

Indictment CR–83–305, based on the July 1982 trip, named Nichols, Eakes, Ross, and Lopez, charging conspiracy to import and conspiracy to possess with intent to distribute 100 kilograms of cocaine, as well as with the substantive counts of importation and possession with intent to distribute. Each of the four counts of the indictment begins with the words: "Beginning on or about June 1, 1982, and continuing thereafter up to and including the date of the filing of this indictment [June 24, 1983] ...."

Indictment CR–83–306, based on the August 1982 shipment, likewise contains four counts, conspiracy to import, conspiracy to possess with intent to distribute, and the substantive counts of importing and possessing with intent. This indictment names the four defendants in CR–83–305 and adds another, Byron Abshire, who helped with

unloading. Each count of this indictment refers to 250 kilograms of cocaine, and each count begins with the identical introductory language as that used in CR–83–305 handed up that same day.

Indictment CR–83–168, the indictment growing out of the "rip load," names the same five and adds Griffin, Wanda Colston, Gray and Morris. That indictment charges conspiracy to attempt to import and to import, conspiracy to attempt to possess and to possess with intent to distribute, and it charges attempt to import. The posture of this appeal is such that no issue in CR–83–168 is now directly before the court although obviously they are indirectly involved.

Indictment CR–83–166 was returned on March 25, 1983, charging one count of conspiracy to import cocaine and one count of conspiracy to possess with intent to distribute cocaine. Named as co-conspirators were Griffin, Lopez, Nichols, Morris, Gray, Saltz, Claude Griffin II, and Henry Polakow. As noted, Nichols was found guilty of both conspiracy counts. Each count of that indictment begins: "Beginning on or about October 1, 1982, and continuing thereafter until the date of the filing of this indictment ...."

The government takes the position that each trip involved separate, discrete criminal acts, justifying separate conspiracy and substantive counts. The defendant-appellant argues that there was only one conspiracy, encompassing a series of criminal acts. It is Nichols' position that the government may not divide that single conspiracy into multiple separate conspiracies, geared to each substantive offense. Nichols also argues that his conviction on the conspiracy charges bars any subsequent trial on underlying substantive counts. We are persuaded by Nichols' conspiracy argument but reject his argument as to the substantive counts.

### Analysis

At the threshold, we note that when a defendant comes forward with a prima

facie nonfrivolous double jeopardy claim, "the burden of establishing that the indictments charge separate crimes is most equitably placed on the government...." *United States v. Stricklin*, 591 F.2d 1112, 1118 (5th Cir.1979). Nichols has made such a showing, and the government is obliged to establish separate conspiracies by a preponderance of the evidence. That burden has not been met.

 The double jeopardy clause of the fifth amendment guarantees that the government, "with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a confining state of anxiety and insecurity...." *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Specifically, the double jeopardy bar provides three categories of protection:

> [It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

*Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977) (*quoting North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)). *See United States v. Kalish*, 734 F.2d 194 (5th Cir.1984).

In the case at bar, Nichols invokes the second measure of protection; he seeks to avoid a second prosecution after he has been convicted. We must determine whether the conduct described in the multiple indictments, as outlined above, constituted a single conspiracy or multiple, seriatim conspiracies.

 As we stated in *United States v. Kalish*, 690 F.2d 1144, 1151 (5th Cir.1982):

> The commission of crimes at different times does not necessarily prove that the crimes were carried out by different conspiracies. A conspiracy is an unlawful agreement; if the same unlawful agreement has as its object the commission of crimes on different occasions, there is still but one conspiracy.

Nichols' claim that his involvement in one conspiracy has been severed improperly into several parts must be examined in light of our holding in *United States v. Marable*, 578 F.2d 151, 154 (5th Cir.1978), in which we focused on five elements as the keys to the determination whether there was more than one agreement which might be separately charged:

> (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

We examine these factors in turn.

 1. *Time.* The record before us clearly reflects that from June 1982 up through the interrupted fourth load in November 1982, Griffin and Lopez had an on-going cocaine smuggling operation which they intended to continue indefinitely. It was their intent to bring in loads of contraband with regularity, monthly and even more frequently if possible. The actual flights by Nichols were only a few weeks apart and as each trip was placed in motion, the planning for the next trip was already underway.

2. *Personnel.* Lopez was the leader; Griffin was second in command. These two were central to all activities. Nichols was involved in all four incidents. Eakes and Ross were involved in all until their "rip load" and disappearance. The suppliers after the first load were the Rodriguez brothers. Other players moved onstage and off, such as Abshire who helped offload the second load and Morris who was to help with the piloting after Eakes and Ross were shunted aside. When financing for a replacement aircraft became necessary, Saltz came on the scene. The government did not establish the particulars of his par-

ticipation or that of the others charged in the indictment underlying Nichols' conviction. We are not persuaded that Saltz's emergence as a participant in the fourth incident metamorphosed the Lopez-Griffin conspiracy to import and to possess with intent to distribute into separate, discrete conspiracies. Whether one uses similes of wheels, hubs, or spokes, the result should be the same. A mere shuffling of personnel in an otherwise on-going operation with an apparent continuity will not, alone, suffice to create multiple conspiracies. *See United States v. Kalish*, 690 F.2d 1144; *United States v. Scott*, 555 F.2d 522 (5th Cir.1977).

3. *Statutory offense charged.* Nichols was convicted of violating the very statutes he is now charged with violating.

4. *Acts charged—acts proved at trial.* Under drug conspiracy statutes no overt act need be pleaded and proven. However, at Nichols' trial for the fourth incident, the government offered evidence of the entire Lopez-Griffin operation. Evidence of the trips which form the basis of the other three indictments was presented to the jury under Fed.R.Evid. 404(b). The government was allowed to offer the evidence to prove the existence of a plan and to explain the pending conspiracy charge. Nichols argues that this evidence tends to prove the existence of one conspiracy. We agree.

5. *Places.* The geography is identical in all instances: New Orleans and Raceland, Louisiana, Belize, and Colombia.

As we evaluate the facts contained in this record, in light of the *Marable* standard, we conclude that Nichols participated in a single conspiracy to commit multiple violations of the drug control law. That conspiracy (actually conspiracies since each statute—importation and possession with intent to distribute—may be the subject of a separate conspiracy charge), had an essential continuity in personnel, a consistency in method, an identical base of operation, and a singleness of unwavering purpose. In this respect, this case closely resembles *United States v. Ruigomez*, 576 F.2d 1149, 1151 (5th Cir.1978), in which we found the double jeopardy clause implicated because:

> [T]he participants shared a continuing, common goal of buying and selling [drugs] for profit; the operations of the conspiracy followed an unbroken and repetitive pattern; and the cast of conspirators remained much the same.

■ Nichols' second claim is without merit. He insists that the government should be compelled to bring all of the charges arising out of the Lopez-Griffin smuggling operation in one proceeding. Nichols suggests that the double jeopardy clause prohibits any prosecution on substantive charges after a prosecution for conspiracy to commit those substantive offenses. That is not the law in this circuit. Substantive charges may be brought after successful completion of conspiracy charges involving those substantive offenses. *United States v. Kalish*, 734 F.2d 194.

In *Kalish*, the defendant was prosecuted and convicted for his participation in a conspiracy to import and distribute marihuana. When the government subsequently attempted to prosecute for the underlying substantive offenses, Kalish claimed that the second prosecution was barred by the double jeopardy clause. We disagreed, holding that the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is the standard by which we determine whether two offenses are the same for double jeopardy purposes. 734 F.2d at 196–197. *See also, United States v. Dunbar*, 591 F.2d 1190 (5th Cir. 1979), *panel opinion adopted in relevant part and remanded*, 611 F.2d 985 (5th Cir.) (en banc), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980). The *Blockburger* test provides that:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182. Under our application of *Blockburger's* teachings, the offenses of conspiracy to commit a crime and the crime itself are separate offenses. Each requires proof of a fact not required for the other. 734 F.2d at 198. *See also Iannelli v. United States*, 420 U.S. 770, 785–86 n. 17, 95 S.Ct. 1284, 1293–94 n. 17, 43 L.Ed.2d 616 (1975). Nichols' conspiracy convictions provide no double jeopardy obstacle to prosecution of the pending substantive charges. However, the pending conspiracy charges are barred by the double jeopardy clause.

AFFIRMED in part; REVERSED in part.