**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James R. GOFF, Benjamin Phillip Barrington, Romulo Lon Kuntze, Terry B. Drewes, and Horst Schoenhoff, Defendants-Appellants.**

No. 87–1183.

United States Court of Appeals, Fifth Circuit.

June 2, 1988.

Opinion on Rehearing July 18, 1988.

John Eichman, Dallas, Tex., (Court-appointed), for Romulo Lon Kuntze.

Steve Orr, Orr & Davis, Austin, Tex., for Terry B. Drewes.

Lius E. Islas, Douglas Gelo, El Paso, Tex., for Horst Schoenhoff.

Stephen Stein, Oscar & Goodman, Las Vegas, Nev., for Barrington.

Charles Louis Roberts, El Paso, Tex., for Schoenhoff.

Joseph Cronin, Minden, Nev., (Court-appointed), for Goff.

**156**

Mervyn Hamburg, Dept. of Justice, Washington, D.C., Sidney Powell, Asst. U.S. Atty., Dallas, Tex., for U.S.

Before RUBIN, KING and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Five appellants raise numerous issues challenging their convictions on multiple counts relating to several importations or attempted importations of marihuana and cocaine between June 1984 and August 1985. The original indictment contained twenty-nine counts against twenty-six defendants. Shortly before trial, certain counts were dismissed without prejudice, leaving eighteen remaining counts. The government proceeded against eight of the defendants in a six-week trial that commenced December 1, 1986, and generated some six thousand pages of record and transcript.[1]

The eight brought to trial included the appellants, Benjamin Phillip Barrington, Terry B. Drewes, James Ruth Goff, Romulo Lon Kuntze, and Horst Schoenhoff.[2] Several of those initially indicted plea bargained and testified for the government: Aura Henriquez de Becerra, David Duke, Robert Finchum, George G. Gantt, Lloyd Wayne Green, Randy Lee Hunt, Alvaro Munoz, and Weldon Eugene Wyatt.

We conclude that the prosecutor engaged in some misconduct, and that some of the appellants' convictions must be reversed for lack of adequately strong supporting evidence. We affirm convictions on the majority of the counts. In addition, we find that two of the conspiracies charged were actually parts of a single, on-going conspiracy; we vacate convictions on the related counts, and remand so that the district court can enter judgment appropriately, as the government may elect.

## I. FACTS

### A. *Episodes, Counts and Participants*

Essentially, the government charged some or all of the appellants with involvement in five sets of episodes or activities, three of which gave rise to multiple counts.[3] The five sets were labeled during trial as the Fort Stockton, Tye, Granbury, Maraquita, and Arauca episodes.

*Fort Stockton: Count 6* (June—October, 1984)

Four of the appellants, Barrington, Drewes, Goff,[4] and Kuntze, together with several others,[5] were charged with conspiracy to import more than one kilogram of cocaine from southern Colombia to Fort Stockton, Texas, during the period June through October, 1984, in violation of 21 U.S.C. §§ 952, 960 and 963. According to the government's theory, Barrington planned the transaction; he and Kuntze would arrange for the pick-up through two Colombians, Munoz and de Becerra. Goff and Drewes would pilot Barrington's Titan 404 Cessna to Colombia and back to Texas. The load was to be "kicked out" over the Fort Stockton drop site and picked up by a ground crew which included Tom Spratlen and others. Spratlen had long worked for Barrington. He became a government informer early in September, 1984, while the alleged conspiracy was being carried out. Later, he was the government's principal

---

1. In addition, this Court has continued to receive various post-argument motions and other filings through May 12, 1988.

2. The others were Lloyd Wayne Green, who pled guilty to a superseding one-count information early in the trial, Dana Carl McChesnee, whom the government dismissed later during trial, and Noble Lee Simpson, who was convicted but did not appeal.

3. Counts 7, 8, 13, and 19 charged appellant Barrington with interstate and foreign travel, and use of communications facilities in connection with one or another of these episodes. He does not appeal his convictions on these counts, and we do not further describe or review them.

4. Goff was generally referred to as "Cornbread" or "C.B." by witnesses during the trial.

5. Others allegedly involved were de Becerra, Finchum, Gantt, Munoz, and one Eduardo, whose last name apparently was Pineda.

witness at trial as to this and most of the other counts.

Because the southern Colombian pick-up point would have been beyond the range of the Titan 404, the cocaine "stash" was to be moved to a more northerly location. Before the move was accomplished, however, the cocaine was reportedly confiscated by the Colombian army, and the planned importation was cancelled.

*Tye: Counts 9 through 12* (November—December 3, 1984)

According to the government, four of the appellants, along with others, planned and effectuated the importation of nearly 1,000 pounds of marihuana from Belize in November and early December, 1984. Goff was alleged to be in charge of this load, Drewes was his co-pilot and "kicker," Schoenhoff was the "contact" with the Belizian source or growers, and Barrington loaned Drewes and Goff a Loran navigational instrument to assist the venture.[6] On December 1, Goff and Drewes flew a Twin Bonanza from Sweetwater, Texas, to Belize and picked up the marihuana. The initial plan was to "kick" the load at a drop site near Fort Stockton. Goff and Drewes, however, decided instead to land at Sweetwater airport, where they brought the airplane into Poe Hangar which had been leased by a co-conspirator. Drewes and others loaded the marihuana from the airplane onto a truck which had been outfitted with a camper shell to conceal its contents. After the loaded truck had been parked at a number of locations it was finally driven to Tye, Texas, where government agents seized 969 pounds of marihuana from the truck.

*Count 9* charged appellants Barrington, Drewes, Goff, and Schoenhoff, and others, with conspiracy to import approximately 1,000 pounds of marihuana, from November through December 3, 1984, in violation of 21 U.S.C. §§ 952, 960, and 963.

*Count 10* charged appellants Barrington, Drewes, Goff, and Schoenhoff, and others, with importing more than 50 kilograms of marihuana[7] on or about December 2, 1984 in violation of 21 U.S.C. §§ 952, 960, and 18 U.S.C. § 2.

*Count 11* charged appellants Drewes and Goff, and others, with conspiracy to possess with intent to distribute over 50 kilograms of marihuana[8] from November through December 3, 1984, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

*Count 12* charged appellants Drewes and Goff, and others, with aiding and abetting another individual to possess with intent to distribute approximately 967 pounds of marihuana on or about December 3, 1984, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

*Granbury: Counts 14 through 21* (November 28, 1984—January 17, 1985)

Here all five appellants were charged with planning to import and actually importing a load of marihuana from Belize to Texas. The government's theory is that Barrington was in charge of this operation, that Goff and Drewes were the pilots, and that Spratlen along with others were to be the ground crew. The aircraft used was Barrington's Titan 404. The load of some 45 bags of marihuana was dropped at a site near Pecos, Texas on the night of January 4, 1985. Thirty-eight bags were retrieved by the ground crew,[9] and loaded onto a truck which was driven to Odessa and parked for the night at Spratlen's motel. The next day as the truck was driven off government narcotics officers followed it to a secluded house at Lake Granbury, Texas. After further surveillance, the officers executed a search warrant on January 6, 1985. They seized 968 pounds of mari-

---

**6.** Others allegedly involved in the Tye episode included Gantt, Rod Burgess (also known as Adam), Kent Alan Fuhrman, Randy Lee Hunt, and Don Parker.

**7.** 21 U.S.C. § 960(b)(4) establishes 50 kilograms as a breaking point for serious punishment in the importation of marihuana.

**8.** 21 U.S.C. § 841(b)(1)(D) likewise establishes 50 kilograms of marihuana as the breaking point for more serious punishment.

**9.** The seven other bags, which contained between 250 and 275 pounds of marihuana, were picked up at the drop site the next day by DEA agents.

huana from the truck and the house. Spratlen testified that after the load had been confiscated Barrington nevertheless insisted that those who had received the marihuana prior to seizure would still have to pay for it. Spratlen also testified that on January 9 or 10, Barrington and Schoenhoff flew to Las Vegas carrying a total of $660,000.

*Count 14* charged the five appellants and others with conspiring to import approximately 1,250 pounds of marihuana from Belize to Texas, between November 28, 1984 and January 17, 1985, in violation of 21 U.S.C. §§ 952, 960 and 963.

*Count 15* charged that on or about January 4, 1985, appellants Drewes and Goff imported over 50 kilograms of marihuana from Belize to Texas, and that Barrington and Kuntze, along with others, aided and abetted the importation offense, in violation of 21 U.S.C. §§ 952 and 960, and 18 U.S.C. § 2.

*Count 16* charged Barrington with traveling in interstate commerce to Odessa and then to Dallas, Texas, with intent to distribute the proceeds of an unlawful activity, namely a business enterprise involving marihuana, and related unlawful activities on or about December 16, 1984, in violation of 18 U.S.C. § 1952.

*Count 17* charged Barrington, Drewes, and Goff with traveling in interstate commerce from Sweetwater, Texas, to Missouri with intent to distribute the proceeds of an unlawful activity, namely, a business enterprise involving marihuana, and related unlawful activities, on or about December 21, 1984, in violation of 18 U.S.C. § 1952.

*Count 18* charged Barrington and Schoenhoff with traveling in interstate commerce from Fort Worth, Texas to Las Vegas, Nevada, with intent to distribute the proceeds of an unlawful activity, namely, a business enterprise involving marihuana, and related unlawful activities, on or about December 24, 1984, in violation of 18 U.S.C. § 1952.

*Count 20* charged all five appellants and others with conspiring to possess with intent to distribute over 50 kilograms of marihuana from on or about January 3 to January 6, 1985, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

*Count 21* charged that on or about January 6, 1985, other co-conspirators possessed with intent to distribute over 50 kilograms of marihuana, and that all five appellants, along with others, aided and abetted the commission of the possession offense in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

*Maraquita: Count 25* (January—July, 1985)

The government's theory as to this episode is that Barrington decided to sell his aircraft and use the proceeds to bring in a big cocaine load from Colombia. The Titan 404 was sold for some $170,000 in late January or early February, 1985. Barrington again was alleged to be the principal organizer of the conspiracy. He obtained a Merlin turbo-prop airplane in Oklahoma City. He and Kuntze arranged for a cocaine "source" in Colombia. The plane took off for Colombia on June 24, 1985, from New Orleans, carrying Barrington and a crew of three others who are not involved in this appeal. The Merlin ran low of fuel and landed at Maraquita airport in Colombia on June 24. Barrington and the others were arrested by Colombian authorities and charged with violation of Colombian air space. The Merlin was confiscated by Colombian authorities, but no drugs or other contraband were found on it. Two weeks later, Barrington put up bond and left Colombia.

*Count 25* charged appellants Barrington and Kuntze, along with others, with conspiracy to import over 50 kilograms of cocaine from Colombia to Texas between January and July, 1985, in violation of 21 U.S.C. §§ 952, 960, and 963.

*Arauca: Count 27* (July—August 11, 1985)

Here, again, according to the government, Barrington attempted to bring in "the big load of cocaine." This time, his plan was to take a commercial flight to Colombia, there obtain a Colombian aircraft, and fly it to Arauca, near Bogota, Colombia, where he would pick up the cocaine. He traveled to Colombia and then

flew in a Colombian registered airplane with a Colombian pilot and co-pilot to Arauca. But he was arrested there, and the plane was seized on July 31 or August 1, 1985. Barrington had $13,800 in $100 bills with him at the time of the arrest. No drugs were found on the aircraft, nor did Colombian authorities charge Barrington with any narcotics offense.

*Count 27* charged Barrington, Goff, and Kuntze and others with conspiring to import more than one kilogram of cocaine from Colombia to the United States in or about July through August 11, 1985, in violation of 21 U.S.C. §§ 952, 960, and 963.

### B. *Trial, verdicts and sentences*

At trial, numerous witnesses presented testimony as to the several episodes and a variety of extrinsic offenses. A number of issues arose in connection with procedures during the trial. Additional relevant facts will be set out below in connection with the issues raised on appeal.

The jury returned verdicts on January 12, 1987. With one exception,[10] it found all appellants guilty on all counts. The court subsequently sentenced appellants to a combination of concurrent and consecutive sentences and fines totalling as enumerated: Barrington: 90 years and $1,000,000; Drewes: 35 years and $90,000; Goff: 50 years and $300,000; Kuntze: 35 years and $70,000; and Schoenhoff: 35 years and $260,000.[11]

### II. ISSUES ON APPEAL

Appellants filed timely appeals. Pursuant to Rule 28(i), Fed.R.App.P., appellants Drewes, Goff, and Kuntze adopted by reference all arguments, points and authorities pertaining to them that were presented by the other appellants. We turn first to contentions relating to all appellants and afterwards to those raised by appellants individually.

10. Drewes was found not guilty as to count 6, the Fort Stockton cocaine conspiracy.

11. This summary does not include special parole terms or mandatory special assessments of $50 per count.

### A. *Issues relating to all appellants*

Six issues potentially affect all appellants. Four of these can be treated briefly. Two others are more substantial. Five of these issues relate to procedural matters that occurred during the trial or sentencing.

### 1. Submission to the jury of an unedited copy of the indictment

■ Appellant Schoenhoff contends that the original, unredacted, twenty-nine count indictment may have been given to the jury. In this event, he asserts that he and the other appellants would have suffered prejudice as a result of "extraneous" charges contained therein. He states that his trial counsel had advised him that evidence in the Barrington record "indicates a high probability" that the complete original indictment was given to the jury. Schoenhoff does not refer us to particular record pages. We find no indication in the Barrington volumes or elsewhere in the record that the jury saw the unredacted indictment. We do find that the trial judge told the jury that several counts had been omitted from the copy of the indictment he was giving them. We find this contention totally lacking in merit.

### 2. Invasion of jury privacy and ex parte communication

■ Appellant Barrington[12] asserts that jury deliberations were invaded when, on Friday, January 9, 1987, the trial judge received a partially completed verdict form from the presiding juror for "safekeeping" over the weekend. The court made a memorial as to this event in an order which sealed the form.

Barrington first urges that appellants were prejudiced because "the jury must have considered themselves bound by the partial verdict—without any power to alter or change their tentative views." He of-

12. Appellant Schoenhoff also adopts this issue on appeal.

fers no evidence or cogent argument in support of this contention. Second, Barrington claims that the incident constituted proceedings outside the presence of defendants in contravention of Rule 43(a), Fed.R. Crim.P. Since safekeeping was the only purpose of the court's action, this was not a court proceeding requiring the presence of the accused. Third, he complains that the requirement of Rule 31(a) that jury verdicts be returned to the judge in open court was violated, and cites various cases holding that a judge's questioning a jury during the course of its deliberations regarding its numerical division is reversible error. Appellant, however, offers no evidence that any portion of a jury verdict was "returned" to the judge or that the court engaged in such questioning. The form was simply a jury worksheet at that time. We find no error.

3. Arbitrary or politically-motivated sentencing

 Appellant Barrington contends that the court's remarks at the time of sentencing indicated improper political motivation. The court's statement was as follows:

> Let me make this general comment that will apply to this case today and I won't repeat it with each. Congress has recognized a significant problem caused by drugs in this country. Just last fall it enacted the Antidrug Abuse Act of 1986 which involves very, very stiff penalties, much stiffer than those that apply in this case.
> What I am saying is that the people of this country through their elected representatives have made it very plain how they feel about drugs and the drug problem.... They end up in the hands of children as well as adults.
> Now, I have before me a man who has been found guilty by a jury beyond a reasonable doubt on several repeated instances of trying to bring drugs into this country. In my opinion, based on the evidence, he has shown call[o]us disregard for the laws of this country.
> I don't believe leniency is appropriate in this case at all. I don't think I need to

say anything else. The sentence will reflect my feelings on it.

Clearly the first two paragraphs quoted were meant to apply to all appellants, not only to Barrington.

Barrington asserts that the judge was "acting more as a legislator than a jurist," by imposing a sentence "far exceeding the range of propriety," and that the sentence was therefore cruel and unusual in violation of the Eighth Amendment.

The court might more aptly have referred to public policy considerations rather than to its own "feelings," but it clearly did not abuse discretion by referring to societal concerns. Courts have "very wide discretion" in determining an appropriate sentence. *Wasman v. United States*, 468 U.S. 559, 563, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984). It is not improper for a court to consider the adverse effects of drugs on communities, a convicted offender's persistent disrespect for the law, or his leadership role in drug trafficking activities. *United States v. White*, 748 F.2d 257, 261 (5th Cir.1984); *United States v. Hawkins*, 658 F.2d 279, 289–90 (5th Cir.1981); *United States v. Jackson*, 649 F.2d 967, 983 (3d Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 574, 70 L.Ed.2d 479 (1981). The sentences were related to acceptable goals of punishment, and are not grossly disproportionate to the severity of the offenses for which appellants were convicted. They were not, therefore, cruel and unusual. *Coker v. Georgia*, 433 U.S. 584, 593, 97 S.Ct. 2861, 2866 (1977). We conclude that the court's sentencing violated no constitutionally protected rights.

4. Admission of testimony by paid informer Tom Spratlen

Appellants Drewes, Goff, Kuntze, and Schoenhoff argue that the district court committed reversible error by denying their motions with respect to testimony by the government's paid informer and principal witness, Tom Spratlen. They contend that the court erred by admitting Spratlen's testimony, by denying their motion to strike that testimony in its entirety, by

failing to give the jury special cautionary instructions regarding it, and finally, by denying their motion for mistrial because of it.

Record evidence indicates that Spratlen had "heard" that the government had targeted Barrington and would pay as much as $250,000 for evidence against him. Spratlen then approached the government and became a government informer in September, 1984. By the time of trial, he had already received over $62,000 in expenses and "reward" payments. The evidence further shows that a DEA agent present throughout Spratlen's testimony planned to recommend at some time "in the future" that he be paid an additional amount between $100,000 and $200,000. Further, it was shown that in return for giving his testimony, Spratlen expected to receive a percentage of the money and other property seized from appellants. Finally, Spratlen indicated that he believed the total amount he was to receive, possibly as much as $250,000, would depend upon the success of the prosecution.

■ Under our en banc decision in *United States v. Cervantes-Pacheco*, 826 F.2d 310 (5th Cir.1987), *cert. denied, sub nom. Nelson v. United States*, — U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988), the credibility of a compensated witness, like that of a witness promised a reduced sentence in exchange for testifying, is for the jury to determine. The government may not, of course, deliberately use or encourage the use of perjured testimony. It must make complete and timely disclosure to the accused concerning any fee arrangement with the informant, and the accused must have adequate opportunity to cross-examine the informant and government agents about any agreement to compen-

sate. Further, the trial court must give the jury careful instructions pointing out the suspect credibility of a fact witness who has been or expects to be compensated for his testimony. *Id.* at 315–16. Appellants had full opportunity to cross-examine Spratlen and government agents as to compensation arrangements, and they did so extensively in the course of trial. The court properly instructed the jury.[13] Appellants do not claim that the government deliberately put on perjured testimony or failed to make complete and timely disclosure as to its fee arrangement with Spratlen. We find that the court did not err by denying appellants' motions regarding Spratlen's testimony.

5. Prosecutorial misconduct

■ All appellants present a series of claims concerning alleged prosecutorial misconduct during trial and in closing argument. We immediately dispose of their contention that during trial the prosecutor improperly stated that some of the defense attorneys and their clients spoke Spanish. The jury was instructed to disregard the remark, and no prejudice was shown. More serious objections are made to the prosecutor's closing argument. It is urged that he improperly attempted to bolster the credibility of government witness Spratlen's testimony. Further he is charged with improperly attacking the integrity of defense counsel. Finally the claim is made that he improperly undertook to bolster the government's case by emphasizing the official nature of his office as government prosecutor, by implying that he had personal knowledge as to appellants' guilt based on out-of-court information, by asserting his own personal opinion as to their guilt, and by stating that their guilt was known

---

13. The "Court Charge," copies of which were provided to each juror, included the following instructions: "The testimony ... of one who provides evidence against a defendant as an informer for pay ... or for personal advantage ... must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by his interest in the outcome of the case ..., or

by the benefits that he has received ... financially ... ; and, if you determine that the testimony of such a witness was affected by any one or more of those factors, you should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt."

to other branches of government. Appellants contend that the prosecutor's conduct abridged their Fifth Amendment due process rights and their Sixth Amendment right to assistance of counsel.

### (a) *Bolstering credibility of witness Spratlen's testimony*

 Appellant Goff complains that the government prosecutor improperly bolstered Spratlen's credibility by offering his personal opinion as to the latter's veracity. In closing argument, the prosecutor stated:

> First of all, they have got to convince you that Tom Spratlen was lying because Tom Spratlen was right in the middle of all this that was going on. He was there in person and he's telling the truth and he makes each of them guilty of everything they are charged with in the indictment. They have got to convince you he's lying.[14]

Counsel for appellant Drewes objected[15] that the quoted argument misstated the court's charge as to the burden of proof.[16] None of the appellants, however, objected at trial to the prosecutor's bolstering the credibility of Spratlen's testimony. Consequently, this Court must apply plain error analysis to determine whether the prosecutor's argument seriously affected the fairness, integrity, or public reputation of judicial proceeding and resulted in a miscarriage of justice. *United States v. Livingston*, 816 F.2d 184, 195 (5th Cir.1987). The government contends that the prosecutor's comments "were largely responsive to the attacks by defense counsel upon the credibility of government witnesses." We conclude that this instance of bolstering, standing alone, does not constitute plain error. We shall consider it further, however, in connection with other instances of alleged prosecutorial misconduct.

### (b) *Attacks by prosecutor on integrity of defense counsel*

 Appellants Barrington, Drewes, and Goff contend that in closing argument, the prosecutor improperly engaged in personal attacks on their attorneys. They urge that these attacks went beyond merely rehabilitating government witnesses against challenges by defense counsel. They complain that by inviting the jury to disbelieve and distrust everything defense counsel told them the government seriously hampered their ability to provide a defense and exercise their right to counsel under the Fifth and Sixth Amendments. Appellants cite the following statements by the prosecutor, among others, as examples of this kind of misconduct:

> Every lawyer that has spoken to you from the defense side has taken things out of context. They have ... cut off what they want[ed] to cut off and told you what they wanted [you] to hear and in some cases flat out misstated what the evidence was.
>
> I thought most of the questions [counsel for Goff] asked in some way were a trick question ...
>
> I will suggest to you the—their job is to represent their clients. My job is to represent the United States. I'm not going to tell you what oaths I take and what obligations I have ...

Appellants timely objected to the prosecutor's personal attacks on counsel and moved for mistrial. The court overruled the objection and denied the motion for mistrial.

These attacks on defense counsel fall well short of those that required reversal in *United States v. McDonald*, 620 F.2d 559 (5th Cir.1980) (prosecutor implied that defendant's lawyer helped destroy evidence)

---

**14.** Later, the prosecutor also stated as to witness Spratlen: "Do you think they didn't have and you didn't have every opportunity to have his credibility tested ... [,] and he sat up there and he was able to tell you the truth because he was telling the truth and he was there."

**15.** Before trial, the district court agreed to consider the objection of any defendant's counsel made at trial as made on behalf of all defend-

ants, unless expressly disavowed by other counsel.

**16.** The court overruled the objection, but stated: "I don't understand him to be saying that the defendants have any burden of proof and the jury will be so instructed." The court's charge contained appropriate instructions on the burden of proof.

or *Bruno v. Rushen,* 721 F.2d 1193 (9th Cir.1983), *cert. denied sub nom. McCarthy v. Bruno,* 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (prosecutor suggested that defendant's hiring counsel proved his guilt and that all criminal defense counsel lie and distort facts).[17] They are roughly comparable to statements by the prosecutor in *Livingston,* 816 F.2d 184, to the effect that defendants' counsel "had tried to 'disguise' the truth and create doubt where none existed." *Id.* at 195. Defense counsel in *Livingston* failed to object, and we declined to find plain error. Here, counsel did object, and the court overruled the objection. We defer considering whether these attacks on counsel were harmless until we have considered appellants' remaining points of error regarding possible prosecutorial misconduct.

(c) *Prosecutor's bolstering case by emphasizing his official position and the asserted views of other branches of government involved*

Appellants Barrington, Drewes, and Goff make three closely related claims with respect to another statement by the prosecutor in closing argument. He improperly invoked his official status as government prosecutor to bolster the government's case. He strongly implied that he knew that appellants' guilt was known to other branches of government outside the judicial process. And he invoked the authority of other branches of government as a basis for convicting appellants. The statement is as follows:

> I will suggest to your the—their job is to represent their clients. My job is to represent the United States. I'm not going to tell you what oaths I take and what obligations I have; but I'll tell you one thing, if you believe what these lawyers have suggested to you and some of them have out and out said then you've got to believe that there is a conspiracy but the conspiracy started apparently in Las Vegas and involves the Internal Revenue Service, the Drug Enforcement Administration, the F.B.I., the Texas Department of Public Safety, the United States Attorneys Office, at least in this district and maybe even a judge or two and has [*sic*] just not the case and they know it.

Appellants did not object to this statement at trial.[18] We have previously held that it is particularly improper, indeed, pernicious, for a prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for convicting a criminal defendant. *United States v. Garza,* 608 F.2d 659, 663 (5th Cir.1979). We have also held that the prosecutor may not suggest that evidence which was not presented at trial provides additional grounds for finding a defendant guilty. *Id.* In *Garza* we found plain error and reversed. Here the prosecutor's recitation of government agencies and entities which, he clearly implies, *knew* appellants to be guilty is improper in the light of what we said in *Hall v. United States,* 419 F.2d 582 (5th Cir.1969).

> In considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give what he says the ring of authenticity. The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.

*Id.* at 583–84. If such guidance were not enough, prosecutors should be fully in compliance with the often-repeated, staunch words of Mr. Justice Sutherland in *Berger*

---

**17.** Two appellants mistakenly cite this case as *Doyle v. United States,* 721 F.2d 1195 (1983). *Doyle* is the next case in the Federal Reporter following *Bruno.*

**18.** Appellants did object to the prosecutor's stating, during trial, "[T]he United States ... means me." The objection was overruled.

*v. United States,* 29 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done....
>
> It is fair to say that the average jury ... has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Id.* See also *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985).

The prosecutor further suggested that in order to find appellants not guilty, the jury would have to believe that several governmental agencies and even perhaps federal judges had engaged in a malevolent and illegal conspiracy to convict them. This also was improper argument. See *United States v. Dorr,* 636 F.2d 117, 119–21 (5th Cir.1981); *United States v. Herrera,* 531 F.2d 788, 790 (5th Cir.1976). Confronted with such argument, jurors could be expected to feel that in order to find appellants innocent they would have to abandon confidence in the integrity of government. "The role of the prosecutor in closing argument is to assist the jury in analyzing, evaluating, and applying the *evidence.*" *Garza,* 608 F.2d at 662. It is not to invoke jurors' loyalty to their country or its government as a reason for convicting the accused. *Herrera,* 531 F.2d at 789–90.

#### (d) *Expressions of opinion as to appellants' guilt*

Finally, appellants contend that the district court erred by overruling their objec-

tion and denying their motion for mistrial based on the prosecutor's repeated impermissible comments on their guilt during closing argument. These comments included the following:

> [Government agents] were able to make those two seizures of marijuana without the crooks figuring out how that happened.
>
> [I]f you believe the kind of things that these lawyers have suggested that you should believe so that their guilty clients in the face of tremendous evidence can go free then the first thing you ought to do is to find them not guilty and the second thing you ought to do is go up and talk to the United States Attorney and maybe even go higher than that, [to the] head of [the] Drug Enforcement Administration, [and the] head of the Internal Revenue Service.[19]

We have held that characterizing a defendant as a "hoodlum" was prejudicial error that the trial court on its own motion should have instructed the jury to disregard. *Hall,* 419 F.2d at 587. The prosecutor's characterization of appellants here as "crooks" is not distinguishably less prejudicial or improper. Further, the prosecutor should not have characterized appellants as their attorneys' "guilty clients." This statement poses appellants' guilt as a pre-determined fact. The remark was, moreover, another effort to lead jury members to believe that the whole governmental establishment had already determined appellants to be guilty on evidence not before them. *Garza,* 608 F.2d at 665; *Hall,* 419 F.2d at 587. These remarks are the sort of "foul blows" that the Supreme Court and this Court have long held improper. *Berger,* 55 S.Ct. at 633; *Hall,* 419 F.2d at 588.

By themselves, the prosecutor's comments implying his personal belief in appellants' guilt constitute prejudicial error. In addition, on separate occasions the prosecutor attempted to bolster the credibility of a

---

**19.** The prosecutor's other statements as to appellants' guilt were combined with references to the evidence. We find these statements permissible since they can be understood as intended to advise the jury what it should conclude on the basis of the evidence, rather than as expressions of his personal opinion.

key government witness by assuring the jury that the witness was telling the truth. His insinuation that appellants should be found guilty because their attorneys were trying to deceive the jury was clearly an improper tactic. The prosecutor implied that extra-judicial governmental agencies and personnel had knowledge of appellants' guilt, and he invoked the dignity of his oaths and office as well as the sanctity of state and federal governmental agencies in order to persuade the jury that they should find appellants guilty. These statements were impermissible.

We do not reach the question whether these other instances of misconduct, taken separately or in the aggregate, also rise to the level of error. Their cumulative effect only adds to the prosecutor's misconduct. *Garza,* 608 F.2d at 665–66; *Herrera,* 531 F.2d at 790.[20] We do summarize, however, by stating that the record reveals overzealous and flamboyant argument by the prosecutor which clearly went beyond the prosecutorial propriety defined by the Supreme Court in *Berger* and by this Court in *Hall, supra.*

■ Reversal and remand for a new trial is the traditional remedy for prosecutorial conduct. It is not, however, automatic. The weight of the evidence in the particular case is also to be considered. *United States v. Jones,* 839 F.2d 1041, 1049 (5th Cir. 1988); *United States v. Weddell,* 800 F.2d 1404, 1410–11 (5th Cir.1986). The crucial question on review is whether the prosecutor's remarks cast serious doubt upon the correctness of the jury's verdict.

"Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Jones,* at 1049.

The basic question, then, is whether the jury would have found appellants guilty had it not been for the prosecutor's improper argument. We consider the following factors in carrying out such a review: (1) the magnitude of the prejudicial effect of the statements, (2) the efficacy of any cautionary instructions, and (3) the strength of the evidence of appellants' guilt. *Jones,* at 1050; *United States v. Cardenas,* 778 F.2d 1127, 1131 (5th Cir.1985); *United States v. McPhee,* 731 F.2d 1150, 1152 (5th Cir.1984). We have already concluded that the prosecutor's statements were prejudicial. We note that the court did not issue any special cautionary or curative instructions. It is doubtful that its general instructions were sufficient to counter the effect of at least some of the prejudicial statements.[21] We must therefore consider the strength of the evidence as to appellants' guilt.[22] A conviction should not be set aside if the prosecutor's conduct did not in fact contribute to the guilty verdict and was, therefore, legally harmless. *Cardenas,* 778 F.2d at 1130; *United States v. Beckett,* 706 F.2d 519, 520 (5th Cir.1983). Here, there are five appellants charged on multiple counts, so we confront, in effect, forty different verdicts with the role of prosecutorial misconduct in mind.

---

**20.** Before trial appellant Barrington filed a 36–page motion for an order *in limine* barring the government from engaging in misconduct during argument. The types of misconduct noted included: "Calling the defendant or his attorney names or making derogatory or disrespectful remarks"; "Vouching for the credibility of the prosecution team or witnesses"; "Expressing opinions about the guilt or innocence of the accused"; "Leaning on the authority of his office as a public official"; and "Insinuating that the prosecutor personally knows facts of the defendant's guilt." The government (through the same prosecutor who later made the challenged comments) opposed the *in limine* motion, stating: "The United States has no intention of committing misconduct during argu-

ment." The court granted Barrington's motion in an order filed October 17, 1986.

**21.** The court's standard instructions included the following general admonitions: "You must make your decision only on the basis of the testimony, exhibits, and other evidence ... presented here during the trial.... [Y]ou must consider only the evidence that I have admitted in the case. Remember that anything the lawyers have said is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers have said to you is not binding upon you."

**22.** See also *United States v. Chase,* 838 F.2d 743, 749–50 (5th Cir.1988).

Before turning to the points of error, including the sufficiency of the evidence, raised by individual appellants, we consider one final set of contentions affecting them all.

### 6. Existence and Number of Conspiracies

 Four appellants urge that the evidence showed that they were guilty, at most, of participation in a single conspiracy which the government arbitrarily divided into multiple conspiracy counts, and that their convictions on these counts contravene the Double Jeopardy Clause. The other appellant, Schoenhoff, argues similarly with respect to his convictions on conspiracy counts 9, 14 and 20. All five appellants were charged in two of the conspiracy counts (14 and 20), and each is charged in at least one of the others (counts 6, 9, 11, 25 and 27). We consider whether the government met its burden in proving the existence of the separate conspiracies charged. We reserve for later consideration the sufficiency of the evidence as to each appellant's participation in particular conspiracies.

In a drug conspiracy case, the government must prove beyond a reasonable doubt that the charged conspiracies existed. *United States v. Morgan*, 835 F.2d 79, 82 (5th Cir.1987). Under 21 U.S.C. §§ 846 and 963, the crucial element of a conspiracy is an agreement between two or more persons to commit the offense. *Id.; United States v. Gardea Carrasco*, 830 F.2d 41, 44 (5th Cir.1987). If there is a single agreement that has as its objective the commission of crimes on different occasions, there is still but one conspiracy. *United States v. Kalish*, 690 F.2d 1144, 1151 (5th Cir. 1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *United States v. Marable*, 578 F.2d 151, 153–54 (5th Cir. 1978). For each conspiracy conviction it seeks, the government must prove a corresponding separate agreement. *United States v. Olivares*, 786 F.2d 659, 664 (5th Cir.1986); *United States v. Winship*, 724 F.2d 1116, 1126 (5th Cir.1984).

 Because it is usually difficult to identify the objectives of and the parties to an unlawful agreement, the courts must look to circumstantial evidence in order to determine the conspiracy's scope. *Kalish*, 690 F.2d at 1151. Such evidence may include the conduct of the alleged participants or evidence of a plan or scheme. *Morgan*, 835 F.2d at 82; *United States v. Ayala*, 643 F.2d 244, 248 (5th Cir.1981). The evidence, however, must show beyond a reasonable doubt that two or more persons came to a mutual understanding to undertake to violate the particular laws in question. *Morgan*, 835 F.2d at 82. This Court has established a five-step analysis in order to determine whether the record demonstrates that a given criminal venture constitutes one or more conspiracies. Our approach derives from recognition that the essence of a conspiracy offense lies in the *agreement* to violate the law. *Winship*, 724 F.2d at 1126.

 The five inquiries are commonly referred to as the *Marable* factors. *United States v. Marable*, 578 F.2d 151, 154 (5th Cir.1978). They are: (1) the time frames during which the alleged conspiracies occurred; (2) the extent to which the same persons were involved and the nature of their involvements; (3) whether the statutory offenses charged in the indictments were the same; (4) whether the nature and scope of the defendants' activities charged in connection with each alleged conspiracy were repetitive and continuous; and (5) whether the locations where the events alleged as part of each conspiracy took place were the same. *United States v. Atkins*, 834 F.2d 426, 432–33 (1987); *United States v. Nichols*, 741 F.2d 767, 771 (1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1186–87, 84 L.Ed.2d 333 (1985); *Winship*, 724 F.2d at 1126; *Kalish*, 690 F.2d at 1151–52; *Marable*, 578 F.2d at 154.

Both in opening and closing argument, the government itself repeatedly argued that all of the charged activities, including those involving marihuana, were part of a single, on-going plan to bring in one big load of cocaine.[23] Yet the government did

---

**23.** For example, in opening argument, the prosecutor told the jury: "The main common factor

not charge appellants with taking part in a single, on-going conspiracy.[24] Instead, it charged appellants under seven different conspiracy counts,[25] and the jury was instructed accordingly. What the government intended by continuing to argue that appellants' activities all related to an on-going plan to bring in "the big load of cocaine" is unclear. Perhaps it meant for the jury to assume that appellants' putative agreement to do so would carry over to show that they had also agreed to commit the seven separate conspiracies within the year and a half time frame. If so, such argument was misleading. For each conspiracy conviction the government seeks, it must prove a corresponding, separate agreement. *Winship*, 724 F.2d at 1126.

■■■ Throughout trial, the government gave curiously scant attention to its burden of proving that two or more persons had agreed to commit the offenses charged in each of the seven conspiracy counts.[26] Much of the evidence presented was circumstantial, and was generally offered without reference to particular days, months, or even years. The government rarely focused either testimony or argument on any of the specific counts charged. The same names and locations figured in several different charged conspiracies, and

it often is difficult or impossible to tell which count is being addressed. Confusion is compounded by the fact that a substantial portion of the testimony had to do with extrinsic offenses, some of which were described in great detail, although typically without reference to dates, involving many of the same persons and locations featured in the charged offenses.

As set out below, applying the five *Marable* factors, we find ample record evidence from which to conclude that the government demonstrated the existence of three conspiracies: those two charged in counts 9 and 11 *or* 14 and 20, and the one in count 25. We do not find sufficient evidence to establish the existence of the conspiracies charged in counts 6 and 27.

Count 6: *The "Fort Stockton" cocaine conspiracy, June-October 1984*

■■■ Because this is chronologically the first charged conspiracy we need not apply *Marable* analysis. The question here is whether the record reveals that the government presented strong evidence that two or more persons agreed to commit the charged offense. We find that it does not.

Government witness Spratlen testified as to certain conversations regarding cocaine smuggling and his understanding of what

that you will see through this year and a half window in the lives of these men is an endeavor to bring in a big load of cocaine." "And the plan is that C.B., Cornbread, will do a marihuana load and if it—if all goes well then Barrington will do two loads back to back and with—all of this is directed toward financing the big cocaine load." "That is basically what this indictment, what this case is all about, those five episodes all directed toward doing the big cocaine load with the marihuana deals interspersed in there." And in closing argument, "You know that the planning for this cocaine venture is always there. The intention being that we're going to do some marihuana loads, make some money and then we're going to take that money and use it to bring in a load of cocaine ..." At oral argument, the government conceded that the single conspiracy theory was mistaken and that such statements were "regrettable." This opening argument is another example of the prosecutorial overzealous flamboyance which manifested itself more fully in closing argument. *Supra*.

24. We do not, therefore, consider whether the government may charge defendants both with participation in a single large conspiracy and

with multiple conspiracies within such a conspiracy.

25. Two conspiracies, one to import, the other to possess with intent to distribute, were charged in connection with both the "Tye" and the "Granbury" episodes, making a total of four marihuana conspiracy counts. Counts 6, 25, and 27 charged three separate conspiracies to import cocaine.

26. In opening argument, after correctly stating that a conspiracy involves "an agreement or a mutual understanding between two or more people for a common unlawful purpose," the prosecutor added, by way of illustration, "[I]n any importation, assuming there is two or more people, you will have a conspiracy to do it." (*Id.* at 20). This is incorrect. That two or more persons take part in an unlawful activity may be circumstantial evidence of an unlawful agreement, and hence of conspiracy, but it does not without more prove or constitute an agreement. This inaccuracy was harmless. The jury was correctly charged on the nature of conspiracy.

the "plan" would be. He testified that Goff had flown about the Fort Stockton, Texas, vicinity to show him where the load might be dropped. Another alleged conspirator testified that Goff had told him he could make $5,000 by watching a gate on the road to the site where a load of drugs from Colombia would be dropped, and that he (Goff) and Barrington would be on the plane. There is also testimony that Goff had flown over a pipeline road near Fort Stockton where "a load of drugs" would be dropped. Spratlen did not state he had been present when any agreement to import cocaine was reached.

Goff's participation in discussing possible arrangements for smuggling cocaine could indicate the existence of an agreement, and thus a conspiracy, to import cocaine and his participation in it. However, by the time Goff and Spratlen flew around Fort Stockton, the latter evidently had become a government informer. Neither Goff nor anyone else would have been able to conspire with Spratlen.[27] It is unclear from other testimony whether the drug drop he discussed with Goff was the one charged in count 6. Goff "did not say when" the contemplated drop would take place. Goff's reconnoitering flight near Fort Stockton may just as well have been preparatory to the Tye marihuana drop, which was to be along a pipeline road near Fort Stockton.

Substantial evidence at trial indicated that all discussions during the period of the alleged conspiracy were only preliminary, and that no agreement to import cocaine was reached until after the time frame of the alleged conspiracy.[28] Such testimony came directly from government witnesses who were present at these discussions. Moreover, there was testimony by a government witness that only Barrington was engaged in planning the charged importation.[29] Though circumstantial evidence could indicate Goff's participation in the charged conspiracy, before that could be shown, it must first be proved beyond a reasonable doubt that the conspiracy existed, namely, that there was an agreement to commit the unlawful act or acts charged. *Morgan*, 835 F.2d at 82. The existence of such an agreement may, of course, be proven by circumstantial evidence. Here, however, the circumstantial evidence was vague, undated and speculative. In contrast, there was explicit, consistent testimony from several sources including government witnesses that agreement had not been reached. We conclude that the evidence as to the existence of the conspiracy charged in count 6 is not enough, and that appellants' convictions under this count must be reversed.

*Counts 9 and 11: The "Tye" marihuana conspiracy* [30]

■ More than ample evidence supports the jury's finding that a conspiracy existed in connection with the "Tye load" or episode. Several witnesses testified as to participation by Goff, Drewes, and oth-

---

**27.** *See infra* note 37. Conversations with a government informer, however, can be evidence of a conspiracy between or among other persons. *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir.1984).

**28.** There was testimony that various persons started discussing the idea of bringing cocaine from Colombia in August or September, 1984, but that their interest then was limited to trying to determine what kind of person Barrington was; that later, undated discussion by the same people concerned only "the possibilities of getting a deal together;" and that the parties involved did not reach agreement until November or December, 1984.

**29.** Mr. Gantt testified that neither he, himself, nor Goff, nor Kuntze was involved in the charged conspiracy. Gantt stated explicitly that Goff indicated that he had not agreed to any involvement in the transaction and that when Gantt asked him "whose deal" it was, Goff answered "it's just one of ... Barrington's crazy dope deals." Gantt also testified as follows concerning a conversation in October, 1984: "Mr. Goff had told me that Ben [Barrington] had another setback because of his little, I guess we'd call it episode on his own had been caught when they were moving it from South Colombia to North Colombia and they had burned it, which he was referring to cocaine. And he also said that Ben should stay with what the heck he knows and quit messing around with some heavy duty stuff, as he put it."

**30.** Count 9 charged Barrington, Drewes, Goff, and Schoenhoff with conspiracy to import marihuana. Count 11 charged Drewes and Goff with conspiracy to possess with intent to distribute marihuana.

ers in preparation for and execution of the plan. Goff was said to be in charge of the operation. Two defendants rigged an auxiliary gasoline tank to provide the aircraft enough fuel for the trip to Belize. Barrington loaned his Loran instrument to the pilots. Goff and Drewes told Gantt they had the load of marihuana in his hangar. Two other defendants then transferred the marihuana to a truck, which contained over 900 pounds of marihuana when it was seized.

■ Appellants argue that separate convictions under counts 9 and 11 are multiplicious and violate the Double Jeopardy Clause. It is well settled, however, that the government can impose a separate punishment for each statute a conspirator has agreed to violate, even if there is only one agreement, provided that Congress has authorized such punishment. Sections 846 and 963 are such statutes. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 1140–41, 1145 n. 3, 67 L.Ed.2d 275 (1981); *Kalish,* 690 F.2d at 1151 n. 6. Since the Tye conspiracy violated both conspiracy sections, appellants may be convicted and sentenced under both counts 9 and 11.

*Counts 14 and 20:* [31] *The "Granbury" Marihuana Conspiracy*

■ Here again, more than ample testimony supports the jury's finding of a conspiracy to commit the activities charged. Though most of the testimony came from Spratlen, it was generally corroborated by other witnesses. There was testimony that a number of bags of marihuana had been picked up at the drop site. There was testimony that Barrington, Drewes, and Goff had said that they could not find seven missing bags of marihuana. Officer Lee testified that he and other government agents seized some 900 pounds of marihuana at Granbury and arrested three defendants there. Again, under *Albernaz, supra,* appellants were subject to conviction and sentencing under both counts 14 and 20.

Appellants vigorously contend that the Tye and Granbury episodes were parts of a single continuing conspiracy, and that counts 14 and 20 are multiplicious with respect to counts 9 and 11. They urge that their convictions under both sets of counts therefore violate the Double Jeopardy Clause.

■ To determine whether the evidence describes a single conspiracy or two separate ones, we apply the *Marable* factors, keeping in view the central question: whether the government has proven a separate, corresponding agreement for each conspiracy conviction it seeks. *United States v. Levy,* 803 F.2d 1390, 1394 (5th Cir.1986); *Winship,* 724 F.2d at 1126. Where appellants come forward with a non-frivolous double jeopardy claim, the burden is placed upon the government to prove separate conspiracies by a preponderance of the evidence. *Nichols,* 741 F.2d at 771; *United States v. Stricklin,* 591 F.2d 1112, 1118–19 (5th Cir.1979). Appellants present such a claim here.

(1) *Time.* The Tye conspiracy allegedly occurred between November and December 3, 1984. The Granbury conspiracy allegedly took place between November 28, 1984 and January 17, 1985. Thus the Tye conspiracy overlapped the Granbury conspiracy by six days.

■ The government claims that the time overlap here is minimal. This consideration would not be dispositive, even if there were some time gap between the charged incidents, for the prosecution is not free to separate a single, on-going conspiracy into discrete conspiracies simply by dividing the time frames. *United States v. Manotas-Mejia,* 824 F.2d 360, 366 (5th Cir. 1987), *cert. denied sub nom. Ramirez-Rios v. United States,* — U.S. ——, 108 S.Ct. 354, 98 L.Ed.2d 379 (1987); *United States v. Dunn,* 775 F.2d 604, 607 (5th Cir.1985). See also *Kalish,* 690 F.2d at 1151.

■ The government's main argument for finding that the Tye and Granbury conspiracies were separate is that "arrests have been held to constitute a termi-

---

**31.** Count 14 charged all five appellants with conspiracy to import marihuana; count 20 charged them with conspiracy to possess with intent to distribute marihuana.

nal point for a conspiracy," citing *Dunn,* 775 F.2d at 607. This is not correct. *Dunn* states, in relevant part, "It is well settled that a *person's participation* in a conspiracy ends when the person is arrested for his role in the conspiracy." *Id.* (Emphasis added.) See also *United States v. Postal,* 589 F.2d 862, 888 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). The two persons arrested on December 2 and 3, 1984, played only minor roles and their arrests are totally irrelevant as to the duration of the Tye conspiracy. Even when several members of a conspiracy are arrested, the conspiracy itself is not thereby necessarily terminated. *Kalish,* 690 F.2d at 1151; *United States v. Michel,* 588 F.2d 986, 993–94 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Drug conspiracies involving multiple importation episodes may continue for many months. *Nichols,* 741 F.2d at 771 (6 months); *Michel,* 588 F.2d at 990 (2 years); *United States v. Ruigomez,* 576 F.2d 1149, 1150–51 (5th Cir.1978) (8 months); see also *Atkins,* 834 F.2d at 432; *United States v. Stricklin,* 591 F.2d 1112 (5th Cir.1979). The fact that the Tye and Granbury importations took place within a six-week time frame is exceedingly weak evidence to show that these episodes constituted separate conspiracies.

**(2)** *Alleged co-conspirators.* The same four principals were involved in both episodes: Barrington, Drewes, Goff, and Schoenhoff.[32] There was some turnover in other personnel. But even considerable difference or turnover in personnel between or among ventures does not prove separate conspiracies. In *Kalish,* all four crew members on board a shrimp boat used for the first importation were arrested when the load was seized, while two dozen or more new co-conspirators took part in the second importation. Only four persons were involved in both episodes. *Kalish,*

690 F.2d at 1151. Yet we held the fact "[t]hat the conspiracy must take on additional members to accomplish one of its objects does not in itself establish a different conspiracy." *Id.* In the course of a single conspiracy various "players" such as off-loaders, pilots, and financiers, may move "onstage and off." *Nichols,* 741 F.2d at 771. "A mere shuffling of personnel in an otherwise on-going operation with an apparent continuity will not, alone, suffice to create multiple conspiracies." *Id.* at 772.[33]

Three of the four principals had exactly the same roles in both the Tye and the Granbury episodes. Schoenhoff was the supplier in Belize for both shipments, and he also traveled to Texas after each shipment to monitor its distribution.[34] Goff and Drewes piloted the airplanes used for both flights. Two of the ground crew were the same both times. The only notable difference between the two episodes is some testimony indicating that Goff was in charge of planning the Tye load, while Barrington directed the Granbury operation. This difference, however, appears at most to be a matter of degree. Barrington was substantially involved in the Tye affair.

Without going into the evidence in further detail, we stress that our cases do not require that a single conspiracy must have the same person or persons direct each operation within it. In *Michel,* for example, the active leader of the first series of marihuana importations then receded into the background, though retaining his financial interest, while others organized subsequent ventures. *Michel,* 588 F.2d at 991–94. A single plan does not turn into several plans simply because some members of the conspiracy are cast in more vital roles than others, or because of internal personnel changes. *Id.* at 995. We conclude that possible variation in the extent to which

---

**32.** Kuntze was not charged in the Tye conspiracy, and his activities were not central to Granbury though clearly a part of it.

**33.** Compare *United States v. Futch,* 637 F.2d 386 (5th Cir.1981). There, only two of twenty-one persons named in the two indictments were common to both importation episodes. We

found that the "casts of characters in the two operations were predominantly different" and affirmed the finding of two separate conspiracies. *Id.* at 390–91.

**34.** See *infra,* part II(B)(5)(c) of this opinion.

Barrington was in charge does not constitute a difference sufficient to show that the two episodes arose in the context of separate conspiracies.

■■■ (3) *Statutory offenses charged.* The Tye conspiracy counts, 9 and 11, respectively, charged that appellants violated 21 U.S.C. § 963, which prohibits conspiracies to import, and 21 U.S.C. § 846, which prohibits conspiracies to possess with intent to distribute. The Granbury conspiracy counts, 14 and 20, respectively, charged violations of the same two sections. This circumstance has virtually no significance one way or the other in this case.

(4) *Nature and scope of the activities.* The government concedes that a meeting attended by Barrington, Drewes, Goff and others on November 28, 1984 at the Sunday House in Fort Worth, Texas, pertained to both the Tye and the Granbury alleged conspiracies. The Tye and Granbury episodes both followed a similar pattern. A load of marihuana, in each case weighing approximately a thousand pounds, was supplied in Belize by Schoenhoff. Both loads were transported via aircraft with the same pilots flying round-trip from Texas to Belize and back. Both loads were to be "kicked" or dropped off in secluded locations along an oil pipeline. Two members of the "ground crew" were the same both times. After each delivery, the marihuana was transferred to a truck, which was parked at an intermediate location for some interval and then driven by others for further transfer or distribution. In both cases Schoenhoff evidently traveled from Belize to supervise the distribution process. In both cases, Barrington aided in the ventures, and may have directed them.

In *United States v. Henry*, 661 F.2d 894 (5th Cir.1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982), where we found two separate conspiracies, the locus of one was Detroit, while the other centered in Dallas and Atlanta. Only one person was common to both conspiracies, and there was no evidence suggesting cooperation between the two groups. *Id.* at 897. Here the pattern of operations is much closer to the facts in *Nichols* and *Michel*, which led us, in each case, to conclude that there was but a single underlying conspiracy. In *Nichols*, the accused carried out three of four planned cocaine smuggling importations from Colombia to the United States during a six month period. The importation episodes had common planners. But the cocaine suppliers in Colombia were different, one of the pilots was different, different aircraft were used, and the intermediaries dropped out after the first two trips.

The *Michel* conspiracy was more loosely organized.[35] There were over a dozen separate episodes in which marihuana was flown from at least two different locations in Mexico to more than six different sites in Texas. At least three separate aircraft were flown by five different pilots. Nevertheless, we concluded:

> That each flight was a random, separate venture discrete from the others defies belief. The group's efforts to maintain protected landing sites and the continuous planning and cooperation between the persons involved convince us that this was one scheme to import marihuana which envisioned as many flights as could safely be made.

*Michel*, 588 F.2d 986, 995. A similar comment could be made about the two marihuana ventures in the present case.

(5) *Locations.* In both cases, appellants' and other defendants' activities were alleged to have taken place "in the Dallas [or Fort Worth] Division of the Northern District of Texas, and elsewhere." Belize was the source of the marihuana in both cases, and the intended drop sites, Fort Stockton and Pecos, were in the same vicinity in west Texas.

We conclude from our review of the record that, in the light of the *Marable* factors, the Tye and Granbury episodes

---

**35.** "The evidence adduced by the government at trial established the existence of a loosely organized group of people who, during a period of approximately two years, participated in the importation of marihuana from the Republic of Mexico into the United States." *Michel*, 588 F.2d at 991.

constituted a single, on-going conspiracy. The Double Jeopardy Clause therefore prohibits appellants' convictions on more than one set of counts. The appropriate remedy for violation of the Double Jeopardy Clause is to vacate the sentences in question and remand with instructions to reverse and dismiss all but one set of the redundant convictions. *Olivares*, 786 F.2d at 664. The government may elect which set of counts is to be dismissed: either counts 9 and 11, or counts 14 and 20.

*Count 25: The "Maraquita" cocaine conspiracy*

 The existence of the charged Maraquita conspiracy is established well beyond any reasonable doubt. Spratlen and four others involved testified concerning specific agreements, meetings and activities. This testimony constitutes strong evidence that Barrington and several others had agreed to import cocaine from Colombia during the period January to July, 1985.

Appellants contend that, as the government urged in opening and closing argument, there was only one conspiracy, namely to bring in "the big load of cocaine" and that the marihuana ventures were incidental to but part of that inclusive and continuing conspiracy. They urge that the offense charged in count 25 was part of this single conspiracy. Since we found the evidence too weak to establish the existence of the cocaine conspiracy charged in count 6, we do not consider the relation between the conspiracies charged in counts 6 and 25. But we must evaluate the relationship between the cocaine conspiracy charged in count 25 and the Tye-Granbury conspiracy, applying the *Marable* factors.

(1) *Time.* There is an overlap of seventeen days in January 1985, between the Granbury time frame and that of the count 25 conspiracy. None of the activities charged in connection with Granbury, however, related to preparation for the Maraquita episode. The only January, 1985, act charged in count 25 concerned Barrington's arranging for Gantt to sell his Titan aircraft, allegedly in order to raise money to finance the anticipated cocaine deal.

(2) *Alleged co-conspirators.* All appellants except Kuntze were charged in connection with the Tye episode and all five were charged under the Granbury conspiracy counts. Only Barrington and Kuntze were charged in count 25. One other person was charged under all Tye and Granbury counts, and also under count 25; two others were charged in connection with both Granbury and count 25. That is the extent of the overlap. Twelve persons including appellants Drewes, Goff, and Schoenhoff who were charged in connection with the marihuana episodes do not appear under count 25. Moreover, eight defendants named in count 25 were not charged under the Tye or Granbury counts. Barrington was in charge of the Maraquita operation, as was clearly the case in the Granbury episode. Kuntze's role, as at Granbury, was somewhat uncertain. There was a different "source" for the cocaine in Colombia in the place of Schoenhoff, the marihuana supplier in Belize for the Tye-Granbury loads. Three new persons appeared in the role of intermediates or brokers for the count 25 cocaine. Contrary to his pattern in the marihuana flights, Barrington, himself, went along this time. No evidence at all connects the former Tye-Granbury pilots, Drewes and Goff, with the Maraquita trip. Two new ground crew members appeared for the first time. The cast of characters in the Maraquita conspiracy was significantly different than in Tye-Granbury.

(3) *Statutory offenses charged.* Count 25 charged that appellants Barrington and Kuntze conspired to import cocaine in violation of 21 U.S.C. §§ 952, 960 and 963. Counts 9 and 14 charged violation of these same statutes by the importation of marihuana. In addition, counts 11 and 20 charged appellants with conspiracy to possess marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. The fact that different controlled substances were involved is not dispositive as to whether there were separate conspiracies. *Winship*, 724 F.2d at 1127; *Marable*, 578 F.2d at 154–56. It may suggest, how-

ever, that the nature of the activities was different.

(4) *Nature and scope of the activities.* The overt acts charged in connection with the Tye-Granbury conspiracy were all different from those charged under count 25. There was uncontroverted testimony by a newly named conspirator that the witness had conspired with Barrington, Kuntze, and others to commit the offense charged in count 25. There was no evidence that proceeds of the prior marihuana ventures were to be used, or were in fact used, to finance the Maraquita transaction.[36]

The only similarity between the Tye-Granbury marihuana conspiracy and the Maraquita plan is that each involved round-trip flights from the United States to points South to pick up contraband which then would be dropped in a secluded area and picked up by a ground crew. In summary, the evidence as to the activities involved strongly suggests that the Maraquita venture was grounded in a new agreement.

(5) *Locations.* The Tye-Granbury contraband was obtained from Belize. The Maraquita contraband was to come from Colombia. Other locations differ as well. The locations factor likewise points to a separate conspiracy.

Although there are certain similarities between the Tye-Granbury and the Maraquita plans, the evidence compels the conclusion that the latter plan was based upon a new and distinct agreement, and thus

constitutes a separate conspiracy. We cannot upset the jury verdict on this evidence.

*Count 27: The "Aruaca" conspiracy*

Appellants Barrington, Goff, and Kuntze, and three other defendants were charged under this count with having conspired to import cocaine from Colombia to the United States between July and August 11, 1985. In order to prove the existence of a drug conspiracy, the evidence must show beyond a reasonable doubt that two or more non-governmental persons agreed to commit the alleged offense. *United States v. Toro,* 840 F.2d 1221, 1232–33 (5th Cir.1988). In this instance, the evidence falls far short. A government agent or informer cannot be a co-conspirator.[37] Spratlen was a government informer throughout the course of the activities charged in all counts. There is no record evidence that any of the appellants or other defendants entered into an agreement with anyone other than separately with Spratlen during the time of the so-called Aruaca conspiracy. The evidence is insufficient to support the existence of the conspiracy charged in count 27, and appellants' convictions under this count must be reversed.

**B.** *Issues relating to appellants individually.*

**1. Barrington**

Appellant Barrington argues that the evidence was insufficient to sustain his conviction under several counts.[38]

---

**36.** Spratlen testified that Barrington had received $330,000 from Burgess and Murray in compensation for the marihuana load "taken off" by government agents at Lake Granbury. There is no evidence that these funds were utilized for the Maraquita venture. The government alleged, but did not prove that Barrington intended to finance the Maraquita venture through the sale of his Titan.

**37.** Each of the parties to a conspiracy must have shared the common purpose of attaining its unlawful objective. *W.R. LaFave and A.W. Scott, Criminal Law* 464–65 (1972). A government informer who periodically reports planned criminal activities to government agents in order that those involved in these activities will be arrested, and in hopes of obtaining financial rewards or other benefits cannot be said to share the unlawful objective of

those engaged in the unlawful enterprise. *See Manotas-Mejia,* 824 F.2d at 365; *Elledge,* 723 F.2d at 866; *United States v. Martino,* 648 F.2d 367, 405 (5th Cir.1981), *cert. denied, sub nom. Lazzara v. United States,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). A conspiracy may be proved, however, where it is shown that the government informer acted as a conduit or link connecting many of the activities of the conspirators. *Sigers v. United States,* 321 F.2d 843, 845–46, 848 (5th Cir.1963).

**38.** At oral argument, for the first time, Barrington also challenged the sufficiency of the evidence relating to count 10, but did not offer specific argument in regard to it. We do not review his conviction under this count. *See Matter of Texas Mortgage Services Corp.,* 761 F.2d 1068, 1073–74 (5th Cir.1985).

Count 9 charged Barrington with conspiracy to import marihuana in connection with the Tye episode. We do not lightly infer a defendant's knowledge of and acquiescence in a conspiracy. *United States v. Jackson*, 700 F.2d 181, 185 (5th Cir.), *cert. denied sub nom. Hicks v. United States*, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983). However, the agreement between conspirators may be silent and need not be spoken or explicit. *United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir.1986). We have found ample record evidence showing that Barrington participated in the count 9 conspiracy by working with Goff.

Count 21 charges Barrington with aiding and abetting others in the possession of marihuana with intent to distribute in the course of the Granbury episode. The evidence establishes beyond any doubt Barrington's relation to certain defendants who were engaged in distribution. The evidence also links Barrington with Schoenhoff, who was also engaged in distribution.[39]

Barrington asserts that in order to be guilty of the offense of aiding and abetting, the aiders and abetters must have assisted the principals directly, and that the guilt of the principals must be established at trial as part of the proof of the charge of aiding and abetting. This is not a correct statement of the law of aiding and abetting. It is sufficient to sustain a conviction for aiding and abetting another to commit a crime if the evidence shows that the defendant associated himself with *the venture*, participated in it, and acted to make it succeed. *Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949); *Manotas-Mejia*, 824 F.2d at 367; *United States v. Palacios*, 556 F.2d 1359, 1364 (5th Cir.1977); 18 U.S.C. § 2. Spratlen testified that he and Barrington had flown together looking for the drop site used in the Granbury venture, and that after the drop, Barrington flew over the site looking for the missing seven bags.

Barrington clearly associated himself with the venture which culminated in possession by the principals here charged.

Barrington's brief also asserts that the evidence was insufficient to support his convictions under counts 14, 15, 16, and 20. The record does not clearly establish that Barrington traveled in interstate commerce with intent to distribute the proceeds of an unlawful activity on or about December 16, 1984, as charged in count 16. His conviction under this count must therefore be reversed. We find no doubts raised by the record as to Barrington's guilt with respect to counts 14, 15, and 20, and uphold his convictions on these counts as well as counts 9, 21, and 25.

### 2. Drewes

Drewes contends that the searches of Poe Hangar at Sweetwater and his home contravened his Fourth Amendment rights and that the district court erred in admitting the fruits of these searches following suppression hearings during trial. Drewes does not specify when these searches occurred or which counts he wishes us to review in the light of this contention.[40] We find no error in the court's decision to admit evidence resulting from these searches.

▇▇▇ The court properly held that Drewes lacked standing to contest the search of the hangar and the airplane and car located in it. At the suppression hearing, Drewes failed to assert any property interest in the hangar, the aircraft, or the car. Thus, he may not seek to exclude evidence resulting from these searches. *United States v. Parks*, 684 F.2d 1078 (5th Cir.1982). Drewes' claim, for the first time on this appeal, that he had leased the hangar is untimely and will not be considered.

▇▇▇ Drewes' contention concerning the search of his home is likewise without merit. Officers entered Drewes' home and

**39.** See below, part II(B)(5)(c) of this opinion.

**40.** The record indicates that evidence obtained as a result of the hangar search pertained to a conspiracy charged in count 26, which was dismissed prior to trial. The government indicated that it intended to introduce this evidence as probative extrinsic offense evidence under rule 404(b), Fed.R.Evid.

arrested both him and appellant Goff pursuant to proper warrants. When asked whether there were any weapons in the house, Mrs. Drewes told them there were two and where they were located, and an officer retrieved them. Goff conceded at trial that he consented to the search of his luggage. Drewes lacks standing to challenge the admissibility of the items found in Goff's luggage.

▮▮▮▮ Additionally, Drewes contends that the court erred in allowing the government to introduce in evidence the weapons belonging to him that were seized at the time of his arrest. He argues that these should have been excluded as prejudicial extrinsic evidence under Rule 403, Fed. R.Evid., pursuant to *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Possession of weapons is highly probative as to an accused drug trafficker's criminal intent as "tools of the trade". *United States v. Martinez*, 808 F.2d 1050, 1057 (5th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). The government did not highlight the weapons evidence at trial, and Drewes does not claim that he was prejudiced by their introduction. Their probative value clearly outweighs any likely prejudicial impact. Drewes had not asked the court to make an on-the-record articulation of its probative/prejudicial inquiry. *See United States v. Robinson*, 700 F.2d 205, 213 (5th Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984). The court did not abuse its discretion by admitting the guns into evidence.

Finally, Drewes argues that the Double Jeopardy Clause bars his conviction under counts 9, 11, 12, 20, and 21, since, he urges, these all concern alleged activities within the course of a single conspiracy. We have already considered the double jeopardy question with respect to counts 9, 11, and 20. Since Drewes offers no separate argument as to the evidence or law with respect to counts 12 and 21, we do not consider them on appeal.

**3. Goff**

▮▮▮ Goff asks this Court to find that his convictions under counts 9, 10, 11, 12, 14, 15, 17, 20, and 21 are barred by the Double Jeopardy Clause inasmuch as they all were committed as aspects of a single conspiracy. We have found that the Tye and Granbury episodes constitute a single, on-going conspiracy and that the government must, on remand, choose which set of conspiracy counts [9 and 11, or 14 and 20] is to be dismissed. Goff argues that the substantive and aiding and abetting counts relating to this on-going conspiracy must also be dismissed. It is well established that conspiracy to commit a crime and the crime itself are separate punishable offenses. *Periera v. United States*, 347 U.S. 1, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954); *Nichols*, 741 F.2d at 772–73. It is also well established that conspiracy and aiding and abetting are separate punishable offenses. *United States v. Cowart*, 595 F.2d 1023, 1031, 1033 (5th Cir.1979); *United States v. Krol*, 374 F.2d 776, 778–79 (7th Cir.), *cert. denied*, 389 U.S. 835, 88 S.Ct. 46, 19 L.Ed. 2d 97 (1967). Counts 10, 12, 15, 17, and 21 do not implicate the Double Jeopardy Clause.

▮▮▮ Next, Goff urges that the evidence is insufficient to sustain his convictions under the Tye and Granbury counts charging conspiracy and aiding and abetting, namely, counts 9 and 14 (conspiracy to import), counts 11 and 20 (conspiracy to possess with intent to distribute), and counts 12 and 15 (aiding and abetting possession with intent to distribute and importation). He argues that there was no evidence that he committed these offenses "[b]eyond flying an airplane containing contraband or landing an airplane containing contraband." This highly significant evidence does not stand alone.

There was testimony that Goff had discussed the Tye venture with Drewes and others and that Goff and Drewes had told the owner of the hangar that they had stored the Tye load of marihuana there. Further, Goff arranged to have a long range fuel system installed in Barrington's Titan that was later flown to Belize for the

Granbury trip and Goff used a "debugger" to check the Titan for a suspected "beeper" in December, 1984. Goff, along with Drewes and Barrington, said that they could not find some of the marihuana bags kicked out near Pecos in connection with the Granbury episode. It was shown that Goff was one of those at the January 1985 meeting discussing the Granbury load and expressing puzzlement as to how the Tye load had been "taken off".

We find overwhelming evidence to uphold the jury's findings that Goff was guilty of the offenses charged in counts 9, 11, 12, 14, 15, and 20.[41]

### 4. Kuntze

▇ Kuntze contends that the evidence at trial was insufficient to sustain his convictions for conspiracy and for aiding and abetting in connection with the Granbury episode. He avers that the only evidence linking him with that episode was Spratlen's testimony that on the day following the drop, he and Kuntze drove to the drop site and looked for the missing bags:

> We spent the night there, the following day me and Lon Kuntze went out to the drop site and ... Ben [Barrington] flew over to see if we could find it and he called me on the ground-to-air radio and told me he couldn't see nothing and me and Lon Kuntze walked the drop site to see if we could find the seven bags.

While it would have been legally impossible for Kuntze to have conspired with the government informer, Spratlen, there is strong circumstantial evidence that he was acting pursuant to an agreement with Barrington. There was testimony that Kuntze flew into Fort Worth with Barrington after Barrington learned that some of the bags were missing. It was the next day that Kuntze, together with Spratlen, searched the drop site for the missing bags, while Barrington directed the operation from the air. This is clearly enough evidence to connect Kuntze's activities as conspiratorial with Barrington. We affirm Kuntze's

conspiracy convictions under counts 14 and 20.

The same evidence supports Kuntze's convictions for aiding and abetting.

To prove aiding and abetting, the government must prove that the defendant "associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed." [Citation omitted.] The defendant must share the principal's criminal intent and engage in some affirmative conduct designed to aid the venture. [Citations omitted.]

*Manotas-Mejia*, 824 F.2d at 367. This evidence shows that Kuntze associated himself with the venture and sought by his action to make it succeed. We affirm his conviction for aiding and abetting under counts 15 and 21.

Kuntze also argues that his convictions under counts 6, 25, and 27 are barred by the Double Jeopardy Clause, since only one cocaine conspiracy existed. The point is moot. We have found the evidence insufficient to establish the existence of the conspiracies charged in counts 6 and 27. In summary, Kuntze's convictions under counts 14, 15, 20, 21, and 25 are affirmed.

### 5. Schoenhoff

Appellant Horst Schoenhoff raises issues which we examine in the following sequence: double jeopardy claims; claims as to admissibility of evidence; and claims of insufficient evidence.

#### (a) *Double Jeopardy.*

▇ Appellant contends that the Double Jeopardy Clause bars separate, consecutive sentencing for his convictions under counts 9, 10, 14, 20, and 21 because these offenses were all committed in the course of the same conspiracy and because the same evidence supports all counts.[42] Earlier in the opinion we held that the counts 9, 14, and 20 must be vacated and remanded for election by the government. We also observed that the Double Jeopardy Clause

---

**41.** Goff also argued on appeal that there was insufficient evidence to support his convictions under counts 6 and 27. This contention is now moot, since we find the evidence too slight to establish the existence of the conspiracies charged in those counts.

**42.** Schoenhoff also contends that his conviction under count 18 is barred by double jeopardy.

This contention is frivolous. Travel in interstate commerce necessarily involves an act, or fact, not required to prove the other offenses. That being the case, there is no double jeopardy. *See Ball v. United States,* ¢G470 U.S. 856,¢G 105 S.Ct. 1668, 1672¢G, 84 L.Ed.2d 740¢G (1985); *Blockburger v. United States,* 52 S.Ct. 180, 182 (1932); *Levy,* 803 F.2d at 1397.

does not bar separate convictions for a substantive offense, aiding and abetting, and conspiracy even though all may relate to the same unlawful activity. We conclude that Schoenhoff's double jeopardy claims are without merit after our holding that Tye and Granbury were one conspiracy.

(b) *Admissibility of evidence.*

■ Schoenhoff claims that the court erred in admitting testimony that he was known as "Frenchie." He also objects to the admission of statements alleging that "Frenchie" was or was to be the source for marihuana in Belize. No objection was made at trial to such statements, or to statements explicitly identifying Schoenhoff as the Belize marihuana connection. This objection has not been properly raised on appeal. *United States v. Hamilton,* 694 F.2d 398, 401 (5th Cir.1982). Undoubtedly this testimony was damaging. It was also highly probative. Schoenhoff thoroughly cross-examined the witness concerning it at trial. The jury was entitled to determine its weight. We do not find that the court committed plain error by permitting the jury to hear this testimony. Fed. R.Crim.P. rule 52(b).

Schoenhoff next contends that the court "erred in admitting alleged co-conspirator hearsay regarding the fact that the appellant was to receive and received $330,-000.00 for the 'Granbury' Episode." Having so claimed in headnote fashion, he makes no further argument as to relevant facts or law. We summarily dismiss this claim.

■ Finally, Schoenhoff argues that the court erred in admitting in evidence a piece of paper on which someone had written, "HORST 1206." The document in question was Barrington's charge slip from the Hyatt Regency Hotel in Fort Worth dated January 7, 1985.[43] Appellant claims to have objected at trial that the exhibit was not forwarded in the defense discovery package, but we do not find evidence of such objection on the record. Appellant did object to the authenticity of the entry, and noted in objection that the government had

presented no testimony that either the handwriting or entry was that of a hotel employee. The court admitted the exhibit over this objection, stating that the predicate was sufficient to leave the question of weight to the jury. We find no abuse of discretion in admitting the evidence challenged by Schoenhoff on this appeal.

(c) *Insufficiency of the evidence.*

■ Finally, Schoenhoff argues that the evidence was insufficient to sustain his convictions under counts 9, 10, 14, 18, 20, and 21. Counts 9 and 10 relate to the Tye episode, counts 14, 20, and 21 to Granbury, and count 18 charges travel in interstate commerce on December 24, 1984, with intent to distribute proceeds of an unlawful activity. Having reviewed the record, we find the evidence overwhelming to sustain Schoenhoff's convictions on all counts except number 18.

Contrary to Schoenhoff's assertions on appeal, proof of his connection with the Tye episode does not rest solely on Spratlen.[44] Testimony by others also implicated Schoenhoff. While the truck loaded with marihuana was still parked near Poe hangar, Drewes told the witness that "it would be gone as soon as the Frenchman came and got it." Drewes then identified "the Frenchman" as "the man that loaded them down south." There was further testimony that Drewes and Goff linked "the Frenchman" in other ways with the conspiracy.

Schoenhoff's involvement in the Granbury episode likewise is fully demonstrated by the evidence. Spratlen testified that Barrington told him in mid-December, 1984, that "a man called Horst from Belize would be his Belize connection where he would get the marihuana." Barrington also had introduced him to Schoenhoff prior to the Granbury trip, saying "This is Horst and he's the man from Belize that we'll be doing business with." Afterwards Spratlen talked with Schoenhoff "about going down and picking up some marihuana of high quality."

Spratlen testified further that Schoenhoff told him that he had personally loaded

---

**43.** Evidence was presented that Barrington had registered for rooms 1204 and 1206.

**44.** Spratlen testified that Goff had told him on November 27, 1984, that he was "going to smuggle some marihuana from Belize with a guy named Frenchie," that Horst Schoenhoff was called Frenchie, that Schoenhoff told him that

he had loaded or supervised loading the marihuana later seized at Tye, and that Schoenhoff subsequently expressed puzzlement and concern that it had been seized. The notation on Barrington's hotel charge slip tends to corroborate Schoenhoff's presence on this last occasion as does other testimony by Spratlen.

the Granbury marihuana. There was other testimony that Schoenhoff was closely associated with Barrington and the Granbury episode. According to Spratlen, Barrington and Schoenhoff received money derived from the transaction, and flew with it in their suitcases from Texas to Las Vegas on January 9 or 10, 1985. The government presented corroborating circumstantial evidence, in particular a customs declaration dated January 6, 1985, showing that a person named Horst Schoenhoff had entered New Orleans on that date via an airline serving Belize. In addition, a California narcotics officer who had been keeping Schoenhoff's residence in South Lake Tahoe under surveillance testified that he had seen him there on January 10, 1985, and that on January 11, Schoenhoff had deposited $10,000 in cash at a local branch bank.

Appellant does not offer separate arguments with respect to the Tye and Granbury counts. We merely state, therefor⌐ that we find the evidence supports his convictions under counts 9, 10, 14, 20 and 21.

The government offered no evidence at all to support Schoenhoff's conviction on count 18. It presents no argument with respect to it on this appeal. The alleged travel in interstate commerce on or about December 24, 1984, is beyond the scope of the Tye episode (which yielded no proceeds), but prior to the Granbury importation. It is difficult to conceive how Schoenhoff could have traveled in interstate commerce with intent to distribute the proceeds of an importation that had not yet occurred. The government does not contend that Schoenhoff's travel to Las Vegas on January 9 or 10, 1985—over two weeks later—is the basis for the offense charged in count 18. Schoenhoff's conviction on count 18 must therefore be reversed for want of sufficient evidence.

### III. CONCLUSIONS

■ As a result of our reviewing this extensive record, we hold that counts 9, 11, 14 and 20 which in terms charge two sets of conspiracies all relate to a single, on-going conspiracy. We therefore vacate appellants' convictions under these counts and remand to the district court so that it may enter judgment on whichever set of counts the government elects: either counts 9 and 11, or counts 14 and 20. In view of our

finding of prosecutorial misconduct, we have assessed the evidence with respect to the convictions challenged by appellants and find that it overwhelmingly supports most of the convictions in spite of the misconduct.[45] We do find the evidence too weak to establish the existence of the conspiracies charged in counts 6 and 27, and also to sustain certain appellants' convictions on some of the other counts.

Accordingly, Barrington's, Drewes', Goff's, and Schoenhoff's convictions under counts 9, 11, 14, and 20 are vacated in order to prevent double jeopardy.[46] The district court can enter guilty judgments, as the government may elect, on either counts 9 and 11, or counts 14 and 20.

Barrington's conviction under counts 6, 16, and 27 are set aside. His convictions under counts 10, 15, 21, and 25 are affirmed.

Drewes' convictions under counts 12 and 21 are affirmed.

Goff's convictions under counts 6 and 27 are set aside. His convictions under counts 10, 12, 15, 17, and 21 are affirmed.

Kuntze's convictions under counts 6 and 27 are set aside. His conviction under counts 14, 15, 20, 21, and 25 are affirmed.

Schoenhoff's conviction under count 18 is set aside. His convictions under counts 10 and 21 are affirmed.

AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.

### ON PETITIONS FOR REHEARING AND REHEARING EN BANC

PER CURIAM:

No judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Fed.R.App.P. and Local Rule 35), the Suggestion for Rehearing En Banc by appellant Drewes is DENIED.

The Petition for Rehearing by appellant Kuntze is DENIED.

The Petition for Rehearing by appellant Schoenhoff is GRANTED to the following extent only:

In Part III, Conclusions, of our opinion *supra,* p. 178, we stated that appellants Barrington's, Drewes', Goff's, and Schoen-

---

**45.** We do not here enumerate convictions on counts which appellants did not challenge on appeal.

**46.** We found appellants' other arguments against their convictions on these counts to be without merit.

hoff's convictions under counts 9, 11, 14, and 20 were vacated to prevent double jeopardy, and that the district court could enter guilty judgments at the government's election on either counts 9 and 11, or counts 14 and 20. Appellant Schoenhoff's petition for rehearing points out that he was not charged or convicted under count 11. Neither was appellant Barrington. We recognize that the questioned language is misleading.

To clarify, we here restate this section of the conclusion as follows: Drewes' and Goff's convictions under counts 9, 11, 14, and 20 are vacated in order to prevent double jeopardy, and the district court can enter guilty judgments as the government may elect on one count of conspiracy to import, count 9 or 14, and one count of conspiracy to possess, count 11 or 20. Appellants Barrington's and Schoenhoff's convictions under counts 9 and 14 both involving conspiracy to import, are vacated in order to prevent double jeopardy, and the district court can enter guilty judgments against them as the government may elect on either count 9 or count 14. Barrington's and Schoenhoff's convictions under count 20 are affirmed, there being no double jeopardy concern because they were not charged under count 11, the duplicative conspiracy to possess count. References elsewhere in the opinion to a grouping of counts 9 and 11 or counts 14 and 20 in connection with possible double jeopardy are modified in accordance with the above corrected language.